264 S.E.2d 604 (1979)
J. C. PENNEY CO., INC.
v.
David C. HARDESTY, as Tax Commissioner, etc.
PITTSBURGH-DES MOINES STEEL CO.
v.
Thomas R. GOODWIN, State Tax Commissioner, etc.
RICHARDSON, GORDON AND ASSOCIATES
v.
David C. HARDESTY, Jr., Tax Commissioner, etc.
Carolyn Sue STURGEON
v.
Virginia L. ROBERTS, Commissioner, etc. et al.
Nos. 14389, 14408, 14407 and 14373.
Supreme Court of Appeals of West Virginia.
December 18, 1979.
Concurring Opinion February 12, 1980.
Rehearing Denied January 24, 1980.
Rehearing Denied March 27, 1980.
*607 Chauncey H. Browning, Jr., Atty. Gen., C. Page Hamrick, III, Sp. Asst. Atty. Gen., Charleston, for appellant Hardesty.
Love, Wise, Robinson & Woodroe, Ernest H. Gilbert, David K. Higgins, Charleston, for J. C. Penney Co.
Schrader, Stamp & Recht, Frederick P. Stamp, Jr., Wheeling, for Pittsburgh-Des Moines Steel.
Chauncey H. Browning, Jr., Atty. Gen., Michael G. Clagett, Asst. Atty. Gen., Charleston, for appellee Goodwin, Comm'r Roberts et al.
Kay, Casto & Chaney, Stephen A. Weber, Charleston, for Richardson, Gordon and Associates.
Chauncey H. Browning, Jr., Atty. Gen., Robert P. Howell, Asst. Atty. Gen., C. Page Hamrick, III, Sp. Asst. Atty. Gen., Charleston, for appellee Hardesty.
Pauley, Curry & Thaxton, James M. Sturgeon, Jr., Charleston, for Sturgeon. *605
No. 14408 Rehearing Denied January 24, 1980.
No. 14389 Rehearing Denied March 27, 1980.
*606 NEELY, Justice:
These four tax cases raise once more the perennial problem of the extent to which a state may impose a tax upon activities in interstate commerce. "The history of this problem is spread over hundreds of volumes of [the U.S.] Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future." Freeman v. Hewit, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946). "It would be a Herculean, if not impossible task, to review and harmonize the myriad decisions of the Supreme Court of the United States on the subject of interstate commerce and exactly what incidents thereof may be constitutionally taxed by the States. The dissenting opinions in many of those cases make clear that the task of reconciling all the decisions is more difficult than was the task of Theseus as he threaded his way through the famous Cretan Labyrinth in search of the Minotaur." Roy Stone Transfer Corp. v. Messner, 377 Pa. 234, 243-44, 103 A.2d 700, 705 (1954). "The U.S. Supreme Court's effort to establish a free trade zone within the United States dates from Gibbons v. Ogden, 22 U.S. 1, 6 L.Ed. 23 (1824), and an important part of this effort has been constant federal vigilance to insure that state taxation does not discriminate against interstate commerce." Chesapeake & Potomac Co. v. State Tax Dept., W.Va., 239 S.E.2d 918, 926-27 (1977).
The Court has consolidated these four cases for decision because there is a framework of legal principles which apply in common to all four. In this one opinion we shall attempt to outline all of the current rules which apply to state taxation of activities in interstate commerce.
There are four United States Supreme Court cases since 1975 which form the corners of a perimeter which circumscribes the permissible area in which the states may tax activities in interstate commerce. The first of these cases is Standard Pressed Steel Co. v. State of Washington Dept. of Revenue, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975) which articulated two principles: first, that the state must give something for which it can ask return; second, where the taxpayer alleges that a given tax discriminates against interstate commerce, the burden is on the taxpayer factually to demonstrate the discrimination. We applied this second criterion in Virginia Foods v. Dailey, W.Va., 239 S.E.2d 770 (1977). In Standard Pressed Steel, a manufacturer of aerospace fasteners, with a home office and manufacturing plant in Pennsylvania, challenged Washington's Business and Occupation Tax on the grounds that the manufacturer's business activities in Washington were insufficient *608 to sustain the tax. The manufacturer had one employee in Washington who was paid a salary and who operated from his home near Seattle. His primary duty was to consult with the customer, Boeing Aircraft, regarding its anticipated and current requirements for aerospace fasteners and to follow up any problems in the use of appellant's product after delivery. In addition there was a group of engineers paid by the manufacturer who visited Boeing about three days out of every six weeks. While the manufacturer's resident employee did not take orders from Boeing, the Supreme Court dismissed as frivolous the argument that there were insufficient contacts to support a direct tax when there existed one employee with a full time job within the State of Washington facilitating a valuable contractual relationship between the manufacturer and Boeing. The Court recognized that taxes of this nature create the possibility of double taxation which would discriminate against interstate commerce but reiterated its holding in General Motors Corp. v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964) that the burden is on the taxpayer to demonstrate any alleged discrimination.
The second corner of our perimeter is established by Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977) which held that no state may tax local transactions involving products manufactured or business operations performed in any other state at a higher rate than similar local activities with no out-of-state components. In Boston the State of New York attempted to provide relief from the competitive disadvantage thought to be created by the transfer tax for New York stock exchanges in competition with out-of-state exchanges. A New York statute imposing a transfer tax on securities transactions, if part of the transaction occurs in New York, was amended so that transactions involving an out-of-state sale were taxed more heavily than most transactions involving an entirely in-state sale. The court found that the statute imposed a greater tax liability on out-of-state sales than on in-state sales and, therefore, lacked even-handed treatment demanded by the Commerce Clause. While the focus of the court in Boston was upon an intentional discrimination against interstate commerce in favor of local commerce, a fair reading of the case discloses that any taxing scheme which discriminates in fact, regardless of intent, against interstate commerce is unconstitutional.
The third corner of our perimeter is formed by Complete Auto Transit, Inc. v. Brady, 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977) which rejected any determination about the legitimacy of a tax based upon what the tax is called in favor of three functional criteria: (1) nexus with the taxing state in terms of the tax bearing a fair relation to services provided by the state; (2) fair apportionment; and, (3) nondiscrimination against interstate commerce. In Complete Auto Mississippi attempted to tax a motor carrier which transported to Mississippi dealers motor vehicles manufactured outside the state. The Supreme Court upheld the tax since the activity taxed was sufficiently connected to the State of Mississippi to justify the tax, the tax was fairly related to the benefits provided the carrier, the tax did not discriminate against interstate commerce, and the tax was fairly apportioned.
Finally the case of National Geographic Society v. California Board of Equalization, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977) recognized that there is a difference between a direct tax which is borne by the commercial taxpayer itself and a use tax which is borne by the taxpayer's customers. The National Geographic Society sold magazines by direct mail to residents of California without an intermediary in that state although the magazine had two offices in California which solicited advertising copy but performed no activities related to the seller's operation of its mail order business. The magazine challenged California's right to impose a use tax, which is the mirror image of a sales tax. A use tax is collected when a good is sold from an out-of-state supplier for use within a state, *609 and the Supreme Court upheld the California tax on the grounds that there was sufficient contact between the magazine and the State of California for California to impose the administrative burden on the magazine of collecting the use tax from California residents who subscribed. The Court distinguished between a use tax and a direct tax in terms of the level of contacts necessary to sustain each, and concluded that a nondiscriminatory use tax could be imposed where there were sufficient contacts to satisfy due process standards while a higher Commerce Clause standard would be required to support the imposition of a direct tax.
We shall now proceed seriatim to the four individual cases which are the subject of this opinion.

J. C. PENNEY CO., INC.

v.

DAVID C. HARDESTY, COMM'R

NO. 14389
This is an appeal from a decision of the Circuit Court of Kanawha County holding that the taxpayer, J. C. Penney is exempt from taxation on direct mail order sales serviced outside of the State of West Virginia. The circuit court held in favor of the taxpayer after an adverse decision by the State Tax Commissioner who now contends that the taxpayer's activity within West Virginia constitutes a sufficient tax nexus to allow the State to impose business and occupation tax upon the company's mail order business.
The appellee, J. C. Penney Co., is a retail dry goods company which operates sixteen hundred stores throughout the United States, of which fifteen are located in West Virginia. In addition to selling over the counter at its retail stores, Penney sells through three annual catalogues and a number of special flyers. Catalogues are distributed from the following: credit lists; catalogue request cards mailed in from catalogues or picked up in stores; letters from former customers; lists of customers purchasing a specified volume of merchandise; and, the stores themselves. The catalogues contain order blanks and will give information on approximate cost of items where the mail or shipping cost cannot be precalculated. The taxpayer contends that in most instances where information is sought by the customer in one of its local stores, the resulting sale is completed by the store and the state tax is paid.
Catalogue sales are made in two ways by direct mail and through catalogue desks in Penney's stores. All catalogue sales fall into four categories: customer orders at local catalogue desks where the merchandise is delivered to the local store for delivery to the customer; customer orders at the local store where the merchandise is delivered from out-of-state by mail or interstate carrier directly to the customer; customer orders through the mail direct to the local catalogue center where the customer then picks up the merchandise; and, customer orders by mail direct to the out-of-state catalogue center where the merchandise is delivered back to the customer by mail or interstate carrier. It is only the last category of sales which is in controversy in this appeal.
As part of taxpayer's mail order business the Tax Commissioner is also seeking to tax the finance charges levied by J. C. Penney on its direct mail credit sales. All records pertaining to credit sales made to West Virginia are forwarded to the regional credit office in Pittsburgh, Pennsylvania. Collection of delinquent accounts is the sole responsibility of J. C. Penney through its credit outlet in Pittsburgh. However, there are the following contacts with West Virginia: Credit applicants can obtain application forms from local stores; credit information and employment is verified by local West Virginia credit bureaus; direct mail orders are occasionally serviced by local stores; payments for direct mail sales may be made to local West Virginia stores; and, the taxpayer uses local West Virginia collection agencies and the West Virginia court system to collect delinquent accounts. Furthermore, West Virginia provides consumer protection laws, usury laws, and *610 credit laws which are enforced by West Virginia legal process.
Since the State of West Virginia is attempting to impose a gross receipts tax on direct mail order sales and gross receipts from finance charges to West Virginia residents we must apply a Commerce Clause test to determine whether the tax is valid. There is no offer of proof by the taxpayer that West Virginia's Business and Occupation Tax discriminates in fact against interstate commerce by duplicating any other tax levied in another jurisdiction. Like the manufacturer in Standard Pressed Steel, supra the activities of the taxpayer are greatly facilitated by its overall operations in West Virginia; there are sufficient contacts with the State to support a tax nexus; and, all of the criteria of Complete Auto, supra in terms of fair apportionment, nondiscrimination, and reasonable relationship to the services provided by the State have been met. Accordingly, the judgment of the Circuit Court of Kanawha County is reversed.

PITTSBURGH-DES MOINES STEEL CO.

v.

THOMAS R. GOODWIN, COMM'R

NO. 14408
This is an appeal by the taxpayer of a Circuit Court of Kanawha County ruling that the taxpayer, a Pennsylvania corporation with principal offices in Pittsburgh, is liable for tax on the fabrication and erection of certain structures in West Virginia. The taxpayer is engaged in the design, engineering, fabrication and installation of large steel structures, including elevated water storage tanks and flat bottom storage tanks. In most instances the steel structures are fabricated in Pennsylvania and delivered by the taxpayer to West Virginia where they are erected on foundations built by taxpayer through its selected sub-contractors. In those instances where the steel structures were fabricated and erected on foundations built by others, taxpayer believed no Business and Occupation Tax was due. In the many instances where the structures were built by the sub-contractors, taxpayer paid Business and Occupation Tax only as a split contract. The lower court agreed with the Commissioner that there was sufficient nexus to tax the entire transaction. The primary issue on this appeal is whether the State of West Virginia can tax gross receipts on the entire contract price for designing, fabricating, and erecting storage tanks for West Virginia customers when the actual manufacture of the prefabricated parts of the tanks is carried on outside of West Virginia and the structure is shipped in pieces for the purpose of being erected in this State. We hold that it can.
The taxpayer has been qualified for a number of years as a foreign corporation authorized to do business in West Virginia; however, it has no offices, headquarters, warehouses, or plants in West Virginia nor does it have any permanent employees in the State. All the engineering, drafting, accounting, and related activities are conducted outside the State of West Virginia and the contracts for its sales are executed at the home office outside West Virginia. The installation of the taxpayer's structures, however, is performed in West Virginia by welders, many of whom are hired outside the State. After a project is completed the taxpayer performs tests on the tank and makes additional inspections to insure that the tank is functioning properly. Furthermore, the taxpayer is involved in both the selection of the erection site and the design of the proper foundation, both of which involve several visits to the construction site in West Virginia.
Any West Virginia contractor who employs sub-contractors must pay a Business and Occupation Tax on the amount of the entire contract. Furthermore, all construction in West Virginia involves the assembling of parts manufactured outside of the State of West Virginia. While the prefabrication of a storage tank out-of-state to be assembled in West Virginia is a spectacular example of out-of-state parts being *611 assembled by a contractor, nonetheless, most of the toilets, hardware, kitchen equipment, carpet, windows, and heating systems installed in buildings constructed in West Virginia have been manufactured elsewhere. The taxpayer does not allege that there is any duplication of a tax in this State with a tax imposed by any other state and since there is no factual showing of actual discrimination the facts of this case are within the guidelines established by Complete Auto and Boston Stock Exchange, supra. The roads of West Virginia are used for delivery; the courts of West Virginia are used for the enforcement of claims; the constabulary of West Virginia are used to protect the parts while they are on the construction site; and, all of the social services of the State of West Virginia support the activities of taxpayer's employees while they are working here. Certainly the volume of contacts is far more significant than the contacts found sufficient in Standard Pressed Steel to establish a tax nexus. Accordingly, the judgment of the Circuit Court of Kanawha County is affirmed.

RICHARDSON, GORDON AND ASSOCIATES

v.

DAVID C. HARDESTY, TAX COMM'R

NO. 14407
In this case taxpayer appeals an adverse ruling of the Circuit Court of Kanawha County which affirmed the State Tax Commissioner's assessment of Business and Occupation Taxes against the taxpayer, a partnership of consulting engineers with its principal office located in Pittsburgh, Pennsylvania. During the assessment period, most of the professional fees received by the taxpayer were the result of contracts with the West Virginia State Department of Highways. Gross income received by the appellant during the audit period totaled $1,557,052.43. The primary work product of the taxpayer is engineering drawings and reports. The taxpayer asserts that its work in West Virginia constituted only 5% of the work performed on any single project. In a typical contract with the Department of Highways the appellants would survey a proposed highway route from aerial photographs and, from the photographs, prepare a location report on the route in their Pittsburgh office. After the department selected the preferred route, final engineering plans would be prepared concerning the subsurface makeup of the proposed route. Taxpayer's contacts with West Virginia at this stage consisted of: retaining a boring sub-contractor to drill holes in the field; sending a survey corps into West Virginia to locate where the test holes were to be drilled; supervising the boring to insure that it was done at the proper location and to the necessary depth; taking an occasional field view or inspection of the proposed project; sending right of way investigators to determine number and location of property owners along a proposed route; and, attending public meetings designed to inform a community how the project would affect that community. The bulk of all the work, however, was performed in Pittsburgh using the soil samples from the borings.
In addition to the work within the State listed above, during the assessment period the taxpayer attended 57 meetings in Charleston with the Department of Highways. Appellant also established a West Virginia branch office in Wheeling as proposed in the contract with the Department, and one of appellant's investigators used it while performing his investigation into property rights along the proposed highway. Certainly there are sufficient contacts to meet the requirements of Standard Pressed Steel and National Geographic, supra.
The critical issue in this case, however, is one of apportionment and fair relationship to the services rendered by the State of West Virginia. The taxpayer does not allege that there is any duplication in its tax by the State of Pennsylvania, although it does assert that there is a business and occupation tax levied by the City of Pittsburgh. We do not find the Pittsburgh city tax, regardless of its amount, to *612 be proof of duplication of taxation sufficient to discriminate against interstate commerce under Complete Auto, supra. West Virginia has cities too, and a business which chooses to have its principal office inside a West Virginia city is confronted with a city Business and Occupation Tax in addition to all other State and county taxes. Absent a factual showing that the total taxing scheme of Pennsylvania is such that burdens which are usually borne by states are supported by municipalities so that municipal taxes are disproportionately burdensome and the total taxing scheme of both states amounts, in fact, to double state taxation, we are unable to find that the taxpayer has supported its burden of proving actual discrimination under Standard Pressed Steel, supra.
Absolute nondiscrimination in taxation is impossible to achieve in an intrastate setting much less an interstate setting; therefore, in order to avoid a state tax under the Commerce Clause it is necessary to demonstrate sufficient duplication of taxation that there is an actual discrimination against interstate commerce. Boston Stock Exchange stands for the proposition that it is actual discrimination rather than any exercise in theory or semantics which mobilizes Commerce Clause protection. Consequently it is a fit subject for inquiry whether one state has a taxing scheme which raises the bulk of industry's share of tax revenue through a Business and Occupation Tax while another state has a scheme which raises industry's share through an income tax. If there were such a factual showing it would be incumbent upon both states to apportion their taxes in such a way as to avoid actual discrimination: however, there is no development in this record of this particular question other than naked allegations that Pennsylvania also taxes the appellant's activities. Consequently we have no reason to conclude that the West Virginia tax is either discriminatory or unfairly apportioned to appellant's West Virginia activities.
The mirror image of discrimination against interstate commerce is discrimination in favor of interstate commerce. Taxes are an integral part of costs and a taxing scheme which relieves interstate concerns of all taxation would discriminate in favor of interstate concerns. The taxpayer raises the issue of fair apportionment, and while taxpayer does not support its allegations factually in this case, apportionment as a general subject is a critical issue. "Of course it would make analytic nonsense to talk about a `fairly apportioned' `unapportioned' tax if the concept of `apportionment' were intended to have any real meaning here. Instead, what seems to have happened in cases like Standard is that the Court, while paying lip service to the apportionment principle, has ignored it in fact and has looked to other factors to determine the constitutionality of taxes imposed on the unapportioned gross receipts from interstate sales activity. Notwithstanding doctrinal variations, and assuming that nexus requirements have been satisfied, over the past four decades gross receipts taxes on interstate sales have generally been sustained when imposed by the state to which the goods were shipped and prohibited when imposed by the state from which the goods were sent." Hellerstein, "State Taxation of Interstate Business and the Supreme Court," 62 Va.L.Rev. 149, 171 (1976). The proposition is supported by: Evco v. Jones, 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972); General Motors Corp. v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964); and, Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272 (1939).
We accept for the moment the arbitrary rule that where there is double taxation as a matter of fact, a gross receipts tax may be levied in the state of delivery if there are sufficient contacts to create a tax nexus but cannot be levied in the state of manufacture. This seems as reasonable as any other method of apportionment since its universal application will avoid the evil of double taxation and it has the further advantage of being easy to administer. Accordingly the judgment of the Circuit Court of Kanawha County is affirmed.

*613 CAROLYN SUE STURGEON

v.

VIRGINIA L. ROBERTS, COMM'R

NO. 14373
This is an appeal by the Department of Motor Vehicles from an adverse decision by the Circuit Court of Kanawha County that the "use" tax statute, W.Va. Code, 17A-3-4 [1974], violates the Commerce Clause because it does not provide a credit for sales taxes paid by a West Virginia taxpayer purchasing a motor vehicle in another state. The appellee, Carolyn Sue Sturgeon, bought a car in New Jersey in 1974 where she paid a sales tax of $64.75 or 5% of the $1295 purchase price. Approximately one year later, Mrs. Sturgeon applied for a certificate of title and a license plate from the West Virginia Department of Motor Vehicles who informed her that a use tax of $80, or 5% of the $1600 book value of her automobile must be paid. Appellee paid the West Virginia use tax under protest and requested that the Commissioner of Motor Vehicles bring an action for declaratory judgment. When the Commissioner refused, appellee brought an action for declaratory judgment and the circuit court ordered the Department to credit appellee's account with the $64.75 charged by New Jersey and to refund the appellee that amount.
There is no issue in this case of an intentional discrimination against interstate commerce similar to that found in Boston Stock Exchange since all states appear to provide that an out-of-state purchaser of an automobile may avoid the payment of a sales tax in the state of purchase by using a temporary license plate which will be valid long enough for him to return to his home state.[1] Consequently, this taxing scheme is neither designed to coerce West Virginia residents into purchasing automobiles in the State of West Virginia in preference to foreign states, nor does it have that effect. Furthermore this is a use tax case involving a consumer and not a direct tax involving a manufacturer; consequently, it is the due process standard of National Geographic and not a Commerce Clause standard which we must apply. Absent actual discrimination against out-of-state sellers of motor vehicles, the proper focus is upon whether West Virginia may tax one of its residents in this manner.
It is admitted that Mrs. Sturgeon was a resident of the State of New Jersey and used all of the facilities of the State of New Jersey for approximately a year while she drove her automobile on New Jersey roads. Consequently, there was sufficient contact to establish a tax nexus in New Jersey and the tax bore a reasonable relationship to the services provided by that state. Now, however, Mrs. Sturgeon is a resident of the State of West Virginia and is driving her motor vehicle upon West Virginia roads and availing herself of all the services of West Virginia. The West Virginia tax does, indeed, bear a reasonable relationship to the services which are currently being rendered to Mrs. Sturgeon by the State of West Virginia. The appellee asserts that it is unfair to tax her for the entire value of her car after the State of New Jersey has levied a similar tax, but she confuses unfairness with unconstitutionality. There is no question that this duplication of tax may be, indeed, unfair but it is not unconstitutional under the Commerce Clause because the appellee is not involved in interstate commerce. She was a resident of the State of New Jersey and was taxed as such while now she is a resident of West Virginia and is taxed as such. Since Mrs. Sturgeon is not, herself, engaged in interstate commerce in her capacity as driver of a motor vehicle, Complete Auto's requirement of fair apportionment does not apply to her. Certainly she would have fared better in terms of total taxation upon her automobile had she either been a resident of West Virginia at an *614 earlier time or remained a resident of New Jersey, but there is no Commerce Clause violation because there is no interstate commerce. When Mrs. Sturgeon drove her car into West Virginia she did nothing commercial, she merely traveled. The West Virginia tax certainly meets the substantive due process standard that the State action is reasonably related to a legitimate governmental purpose and, therefore, is not infirm on that count. State ex rel. Harris v. Calendine, W.Va., 233 S.E.2d 318 (1977). Accordingly the judgment of the Circuit Court of Kanawha County is reversed.
No. 14389Reversed.
No. 14408Affirmed.
No. 14407Affirmed.
No. 14373Reversed.
MILLER, Justice, concurring:
While I concur in the result reached by the majority opinion in each of these four cases, I believe the legal analysis is so cursory that we have obscured the essential principles by which these cases must be decided.
Several preliminary observations need to be made. Since these cases all involve the claim that a particular tax violates the Commerce Clause of the United States Constitution, we must of necessity consider the United States Supreme Court decisions in this area. To select four Supreme Court decisions as controlling,[1] as does the majority, is not only arbitrary, but of questionable judgment, since the majority ignores significant decisions which have a direct bearing on the present issues.
This selection process by the majority tends toward the absurd when it constructs the syllabus from Virginia Foods of Bluefield, Va., Inc. v. Dailey, W.Va., 239 S.E.2d 770 (1977), which is factually not applicable to the issues at hand. I believe we should openly acknowledge that as a result of recent United States Supreme Court cases, we no longer consider Baton Coal Co. v. Battle, 151 W.Va. 519, 153 S.E.2d 522 (1967), to be good authority.
I also question whether Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), represents the most articulate recent opinion by the Supreme Court on the criteria that will be applied to determine if a given state tax violates the Commerce Clause. Perhaps the most substantial contribution made by Complete Auto was to overrule Spector Motor Service, Inc. v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951), and to establish the general principle that it is the economic consequence, rather than the label, that determines the constitutionality of the tax. The intriguing part of Complete Auto is what it did not expressly decide:
"We note again that no claim is made that the activity is not sufficiently connected to the State to justify a tax, or that the tax is not fairly related to benefits provided the taxpayer . . . ." [430 U.S. at 287, 97 S.Ct. at 1083, 51 L.Ed.2d at 336].
Most commentators appear to view the foregoing statement as a positive holding of the Supreme Court,[2] but it is clear in a reading of the opinion that these claims were not made.
*615 A problem common to both the majority opinion and Complete Auto is the failure to acknowledge that there are two principal constitutional grounds which may be asserted to strike down a state tax. The first ground is the Due Process Clause, where two general restrictions have been found, as set out in Moorman Manufacturing Co. v. Bair, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978):
"The Due Process Clause places two restrictions on a State's power to tax income generated by the activities of an interstate business. First, no tax may be imposed unless there is some minimal connection between those activities and the taxing State. National Bellas Hess, Inc. v. Department of Revenue, 386 U.S. 753, 756, 87 S.Ct. 1389, 1390, 18 L.Ed.2d 505. This requirement was plainly satisfied here. Second, the income attributed to the State for tax purposes must be rationally related to `values connected with the taxing State.' Norfolk & Western R. Co. v. State Tax Comm'n, 390 U.S. 317, 325, 88 S.Ct. 995, 1001, 19 L.Ed.2d 1201." [437 U.S. at 272-73, 98 S.Ct. at 2344, 57 L.Ed.2d at 204.].
The second ground is the Commerce Clause, where the Supreme Court traditionally has had difficulty in articulating precise standards.[3] Moreover, it is sometimes difficult to determine whether the Supreme Court, in its analysis of salient factors, is speaking from the standpoint of the Due Process Clause or the Commerce Clause. See, e. g., General Motors Corp. v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964); Miller Bros. Co. v. Maryland, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954).
In Note 5 of Norfolk & Western Railway v. Missouri State Tax Commission, 390 U.S. 317, 325 n. 5, 88 S.Ct. 995, 1001, 19 L.Ed.2d 1201 (1968), the Court explained the interrelationship between the Due Process and Commerce Clauses in regard to state taxation:
"We have said: `The problem under the Commerce Clause is to determine "what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions." Nashville, C. & St. L. R. Co. v. Browning, 310 U.S. 362, 365 [60 S.Ct. 968, 970, 84 L.Ed. 1254, 1256]. So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State. See Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444 [61 S.Ct. 246, 249, 85 L.Ed. 267, 270]. Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State.' Ott v. Mississippi Valley Barge Line Co., 336 U.S. 169, 174, 69 S.Ct. 432, 434, 93 L.Ed. 585 [589] (1949) . . .."
Thus, it may be that the dictum in Complete Auto, which suggests four criteria by which a tax is tested,[4] is nothing more than an amalgamation of the Due Process and Commerce Clause requirements. This view is reinforced by Department of Revenue v. Association of Washington Stevedoring Companies, 435 U.S. 734, 98 S.Ct. 1388, 55 *616 L.Ed.2d 682 (1978), where a state tax on gross income from in-state stevedoring services was upheld against a claim of a Commerce Clause violation. The Court's summary statement was:
"The Court repeatedly has sustained taxes that are applied to activity with substantial nexus with the State, that are fairly apportioned, that do not discriminate against interstate commerce, and that are fairly related to the services provided by the State [Citations omitted]." [435 U.S. at 750, 98 S.Ct. at 1399, 55 L.Ed.2d at 697].
Despite some confusion in the underlying legal standards it applies, there is no doubt that the present trend of the Supreme Court is to uphold state taxes against the claim that they impinge on the Commerce or Due Process Clauses. Washington Stevedoring contains this significant statement:
"Complete Auto recognized that a State has a significant interest in exacting from interstate commerce its fair share of the cost of state government. [Citations omitted]. All tax burdens do not impermissibly impede interstate commerce.. . ." [435 U.S. at 748, 98 S.Ct. at 1398, 55 L.Ed.2d at 695].
It is with these principles in mind that I approach the issues raised by these four taxpayers.

I

J. C. PENNEY CO., INC.
J. C. Penney Company, Inc. [Penney], disputes taxation imposed on two of its business transactions. Penney does not dispute that it does business in this State through a number of retail outlets and has qualified to do business in this State. It objects, however, to the business and occupation tax imposed on mail order sales, which are those made to West Virginia customers through orders to an out-of-State catalog center which fills the order and sends it directly to the customer.
Penney also disputes the business and occupation tax (W.Va.Code, 11-13-2h), on income it receives from finance charges on its West Virginia sales. The majority opinion at 609 appears to view this tax as being limited to finance charges received solely from Penney's out-of-State mail order sales, but the Tax Commissioner's brief at 15 makes it clear that the tax is not limited to out-of-State sales, which is not denied by Penney.
As is often the case in state tax controversies involving interstate commerce, each party cites the same decisions as supporting its particular position. The heart of the controversy is whether Norton Co. v. Department of Revenue, 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517 (1951), applies to invalidate these two particular taxes.
Norton involved an Illinois tax imposed on the business of selling tangible property at retail, and measured by the gross receipts from such sales. The taxpayer was a Massachusetts company which manufactured and sold abrasive machinery and supplies. It maintained a branch office and warehouse in Chicago from which it made sales throughout Illinois. The state levied its tax on all of the company's sales to Illinois customers. The sales were divided into three categories: (1) direct purchases at the Chicago office; (2) mail orders filled in Massachusetts and sent to the Chicago office for pick-up by the customer, or shipped via the Chicago office to its Illinois customers; (3) mail orders sent directly to Massachusetts and filled by direct shipment to Illinois customers. It was this third category that Norton held to be purely interstate commerce, on the basis that no local service was connected to these sales.
Norton is, of course, persuasive to the position of the taxpayer here, but it was followed by General Motors Corp. v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430, (1964), which involved a Washington business and occupation tax imposed on the gross wholesale price of motor vehicles, parts and accessories shipped by General Motors into the state. At issue were four divisions of General Motors which maintained sales representatives and other personnel in the state. It was admitted *617 that the automobiles, their parts and accessories were shipped direct to the dealers, who were independent merchants and who directly ordered the items from out-of-state manufacturing plants. General Motors had conceded that it was liable for sales made from its Washington warehouse, but contested the tax on automobiles, parts and accessories shipped from out of state to its dealers on their direct orders.
The Supreme Court, without lengthy discussion, sustained the tax, holding: "[W]e look to the taxpayer's business activities within the State, i. e., the local incidents, to determine if the gross receipts from sales therein may be fairly related to those activities." [377 U.S. at 441, 84 S.Ct. at 1568, 12 L.Ed.2d at 435].
General Motors was followed by Standard Pressed Steel Co. v. Washington Department of Revenue, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975). Standard Pressed Steel had one employee in Washington who, operating out of his home, made periodic contacts with the Boeing Company in Washington to determine its needs regarding Standard products. The employee did not make the sales, but advised his home office of Boeing's prospective product requirements. He also arranged for Standard engineers to make periodic consultation visits to Boeing. Boeing directly ordered all products either from Standard's principal office and manufacturing facility in Pennsylvania or its plant in California, which then direct shipped the items.
The State of Washington sought to tax all such sales under its gross receipts tax, which is similar to our business and occupation tax. The Washington courts affirmed the tax and the United States Supreme Court, placing substantial reliance on General Motors, unanimously agreed.
It can be readily seen that Norton's test, whether there is some local service to support the state tax on a particular transaction, has been transformed by General Motors and Standard Pressed Steel into an inquiry as to the extent of the local business of the taxpayer, which is another way of determining the amount of local services the state extends to the taxpayer. Once a substantial local connection is found, then a tax will be upheld if it bears some reasonable apportionment to the local activity.
The taxpayer cannot escape taxation by attempting to isolate his local activities into compartments and by contending that each compartment must be viewed separately without regard to the taxpayer's entire activities within the state. In both General Motors and Standard Pressed Steel, the taxpayer's in-state activities were thought to be sufficient to uphold the tax even though these activities did not have a substantial direct relationship to the activity taxed.
Penney, through its argument that its direct catalog sales have no local connection, attempts to isolate a small area of its overall activity in the State and asks that we merely look at this local nexus. We cannot, however, ignore Penney's substantial business activity through its numerous retail outlets in this State. Moreover, the record demonstrates that its out-of-State direct catalog sales are so closely entwined with its local presence that any attempt to isolate these sales would do violence to customary retailing concepts.
The interrelationship is apparent for several reasons. Penney concedes that three categories of catalog sales, where the local store is directly involved in some phase of either the initial order or the receipt of the merchandise, are subject to tax. Even in the disputed category, it appears that a direct mail customer can return the merchandise to a local Penney store, although Penney does not encourage the practice. Further, it has a local repair service available for catalog sale items.
There is little doubt that Penney's local presence provides a substantial impetus to catalog sales. The customer receives advertising through all forms of local media and the local store is a showcase for the catalog merchandise, and provides to its customers the catalog itself. Thus, to contend that out-of-State catalog sales have no local connection is to ignore business reality.
*618 Penney's finance charges on credit sales in West Virginia are taxable under the same analysis that applies to its out-of-State catalog sales. From a legal standpoint, once its substantial local presence is established, Penney is subject to a fairly apportioned tax on all of its activities within the State, regardless of whether a particular aspect, in isolation, may have fewer local connections.
The business and occupation tax imposed on income from finance charges is found in W.Va.Code, 11-13-2h, and is levied upon a service business not otherwise specifically taxed. Here, the factual focus is on the activities surrounding Penney's extension of credit and collection of credit finance charges from State customers who do not elect to pay their account in full within thirty days from the date of the sale. It does not appear to be disputed that applications for a Penney's credit card, which forms the basis for a credit sale, can be obtained at the local stores.
Although Penney's main West Virginia credit office is located in Greentree, Pennsylvania, it relies on credit investigations by West Virginia agencies. Credit sales are made at local stores, which can also receive credit payments, although most payments are made directly to the Greentree office, which sends the bills. The local store does make adjustment for the return of merchandise received on credit. West Virginia collection agencies and its court system are employed by Penney in its collection of delinquent accounts. Finally, the credit sales are subject to West Virginia usury and consumer protection laws. These factors constitute substantial contacts sufficient to justify the imposition of the tax.
I find unpersuasive the taxpayer's argument that the tax discriminates against interstate commerce. The type of discrimination that must be shown is one where the out-of-state taxpayer is engaged in interstate commerce and is confronted with a state tax which the local taxpayer, involved in the same type of transaction, does not have to pay or pays at a lower rate. Boston Stock Exchange v. State Tax Commission, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977); Maltz, The Burger Court, The Commerce Clause, and the Problem of Differential Treatment, 54 Ind.L.J. 165 (1979). Factually, nothing in the record remotely demonstrates this type of discriminatory pattern, and the statute itself carries no such suggestion.
The taxpayer's claim that the tax is not fairly apportioned must fail in light of General Motors, supra, and Standard Pressed Steel, supra, which teach that the test for apportionment is whether the taxpayer's local business activity bears a reasonable relation to the tax. In General Motors, the Supreme Court discussed the fair apportionment question:
"[T]he question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. . . ." [377 U.S. at 441, 84 S.Ct. at 1568, 12 L.Ed.2d at 435].
In Standard Pressed Steel, even though the taxpayer's activity within the state was far more meager than that of Penney and the tax at issue was a business and occupation tax, the proportionality issue was accorded a cursory discussion:
"In the instant case, as in Ficklen v. Shelby County Taxing District, 145 U.S. 1, 12 S.Ct. 810, 36 L.Ed. 601 (1892), the tax is on the gross receipts from sales made to a local consumer, which may have some impact on commerce. . ." [419 U.S. at 564, 95 S.Ct. at 709, 42 L.Ed. at 724].
While it has been stated that local taxes measured by gross receipts from interstate commerce are to be viewed with suspicion, General Motors, 377 U.S. at 440, 84 S.Ct. at 1567-68, 12 L.Ed.2d at 434-35, I think the statement is overly broad. A business and occupation tax levied on substantial activities of the taxpayer within the taxing state is a fairly apportioned tax, because the local activities or transactions provide not only the tax nexus, but also form the boundary of the tax incident. This State's business *619 and occupation tax is composed of a number of separate taxes on specific business activities occurring within the State.[5] The business and occupation tax does not give rise to the problems surrounding a state income tax, where some type of apportionment standard must be built into the tax statute to segregate local income from that derived from out-of-state sources. See, e. g., Moorman Manufacturing Co. v. Bair, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978). Here, the business and occupation tax has its roots in the local transaction, and by its very nature carries its own proportionality.
Penney argues that by upholding the business and occupation tax in the two involved categories, it will be subject to multiple taxation. In recent years, the United States Supreme Court has placed the burden on the taxpayer to demonstrate the identicality of the multiple tax. Standard Pressed Steel Co. v. Washington Department of Revenue, supra; General Motors Corp. v. Washington, supra. Penney has not met this burden.
I would, therefore, hold Penney subject to the tax. I would, however, grant its claim for relief from the penalties of W.Va. Code, 11-13-11. We have recognized, along with other states, that the tax commissioner may waive penalties in a tax case involving complex legal questions of a first impression, and if he elects not to do so, the court may set aside such penalties. United Fuel Gas Company v. Battle, 153 W.Va. 222, 167 S.E.2d 890 (1969), cert. denied, 396 U.S. 116, 90 S.Ct. 398, 24 L.Ed.2d 309. I would not penalize Penney for what perhaps amounts to a failure to recognize a recent and growing trend on the part of the United States Supreme Court to uphold state taxes in the area here involved, as the tax years in question here were prior to many of the recent United States Supreme Court decisions.

II

PITTSBURGH-DES MOINES STEEL CO.
The taxpayer, Pittsburgh-Des Moines Steel Company, presents a rather limited case involving the business and occupation taxation on its contracting work performed in West Virginia. Its principal contention for avoiding the tax rests upon the theory that many of the steel tanks erected by the company in this State are partially fabricated out of State. Also, in some instances its West Virginia customer prepares the pad on which the metal tank is erected. There appears to be no claim, however, that the taxpayer is not engaged in the contracting business as distinguished from the mere selling of tangible property.
Although the taxpayer maintains no office within the State, it has qualified to do business in this State and admits to hiring local welders to erect its tanks in West Virginia. Its employees also inspect and test the completed structures and are covered by various State programs, such as Workmen's Compensation and Employment Security.
The primary argument of Pittsburgh-Des Moines centers upon the claim that an earlier case decided by the Circuit Court of Kanawha County found that a taxpayer involved in a similar activity was not subject to the tax. This Court, of course, is not compelled to follow that decision.
The specific question of whether a business and occupation tax can be imposed on the gross receipts of a contracting business if some of the contracting material is fabricated out of state was answered in Dravo Contracting Co. v. James, 114 F.2d 242 (4th Cir. 1940), cert. denied, 312 U.S. 678, 61 S.Ct. 450, 85 L.Ed. 1117 (1941). There, a dam contractor contended that certain fabricating work was completed in Pennsylvania before the material was brought into West Virginia, and therefore that he was *620 not subject to the West Virginia tax. The Court, however, held that the out-of-state fabrication was not a sufficient reason to escape the tax:
"The tax here is not upon a unitary enterprise conducted in several states, but upon the business of contracting conducted in West Virginia, and income derived from that business is properly subject to taxation by that state. . . . The fact that the contractor may have prepared materials in other states for use under the contract is immaterial, if they were used in the performance of the contract in West Virginia and payments made the contractor were dependent upon such use." [114 F.2d at 246].
Thus, partial fabrication of the product outside this State does not preclude the State from imposing a contractor's business and occupation tax on the entire contract, so long as the product is incorporated into the contract work and is a part of the total contract price. Cf. Department of Treasury v. Wood Preserving Corp., 313 U.S. 62, 61 S.Ct. 885, 85 L.Ed. 1188 (1941);[6]see, e. g., Republic Steel Corp. v. McCastlain, 240 Ark. 979, 403 S.W.2d 90 (1966); Chicago Bridge & Iron Co. v. Johnson, 19 Cal.2d 162, 119 P.2d 945 (1941).
I do not think that the majority's application of Complete Auto and Standard Pressed Steel is appropriate to the facts of this case. Taxpayer admits that he has qualified to do business in this State and has employees engaged in the erection of steel tanks in this State. Obviously, once the taxpayer has admitted to construction contract work within the State, a claim that there is not sufficient nexus must fail.
I do not understand the majority's citation of Boston Stock Exchange v. State Tax Commission, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). Boston involved a discriminatory tax on interstate commerce. Here, the taxpayer's claim is that the tax is not fairly apportioned. As I note in Penney, this claim is judged by the amount of the taxpayer's local activities and consequent benefits and opportunities that the taxpayer receives in this State.
Certainly the taxpayer, having qualified to do business in this State and concededly erecting steel tanks herein, gains every benefit and protection afforded a local contractor, including those of State Workmen's Compensation and Employment Security and other State services. As I pointed out in Penney, the business and occupation tax is basically assessed upon the activity the company conducts in this State. In the case of Pittsburgh-Des Moines, the tax is applied to gross income from the contracting work performed in this State. The tax is fairly apportioned because it is based on the value of the contract work performed in West Virginia.

III

RICHARDSON, GORDON & ASSOCIATES
In this case, an engineering partnership resists the imposition of the business and occupation tax on gross income arising from services, W.Va.Code, 11-13-2h. The majority opinion notes that despite rather substantial contacts with this State, including a field office in Wheeling, the taxpayer seeks to avoid the tax on the ground that 95% of its engineering work is performed at its home office in Pittsburgh, Pennsylvania. The 95% figure is the taxpayer's estimate, which was arrived at by its determination that the bulk of the work done in West Virginia is not chargeable under its contract.
The factual parallelism with Baton Coal Co. v. Battle, 151 W.Va. 519, 153 S.E.2d 522 (1967), is obvious, and the refusal of the majority to consider this decision is dismaying. Baton involved a Pennsylvania corporation which furnished managerial services *621 and advice to a West Virginia coal mining company. The West Virginia Tax Commissioner sought to collect the service business and occupation tax on the gross receipts obtained under its management contract. This Court held that the company's activity in West Virginia was not sufficient to constitute doing business within this State in order to subject it to the tax.
It is obvious that Baton's definition of what standard constitutes doing business within a state must be altered in view of the more liberal concepts found in General Motors Corp. v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964), and Standard Pressed Steel Co. v. Washington Department of Revenue, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975).
I recognize that it is not a simple task to determine what are sufficient local contacts to cause a service business to be subject to the business and occupation tax. It will often be true, as is the case here, that the local transactions are rather insubstantial when compared to the service provided, but I do not believe that this type of comparison is a viable test under recent standards set by the United States Supreme Court.
In Standard Pressed Steel, the value of the local services performed by its lone employee in the State of Washington and the company's occasional expense of sending its consulting engineers to the Boeing plant were obviously rather miniscule, when compared to the total value of the product sold in the State of Washington.[7] The same is true of the cost of services performed by General Motors personnel in General Motors Corp. v. Washington, supra, who had engaged in rather meager sales and product service activities with dealers. Yet, these activities were sufficient to permit the state to tax the entire wholesale value of all cars and parts shipped to Washington auto dealers by General Motors.
Those states having a business and occupation tax[8] which have had occasion in recent years to consider analogous factual situations, have rather uniformly upheld the tax. In Ramsay Travel, Inc. v. Kondo, 53 Haw. 419, 495 P.2d 1172 (1972), travel agents operating in Hawaii were taxed on income derived from commissions on ticket sales for transportation, lodging and sightseeing tours in other states and foreign countries. The taxpayer contended that the tax should be apportioned, since much of the services which generated revenues upon which the tax was levied were performed outside Hawaii. In rejecting this contention, the court stated:
"[T]hey [taxpayers] would have to show that the state has failed to exert its power of taxation in proper proportion to their activities within the state and to their `consequent enjoyment of the opportunities and protections which the state has afforded.' General Motors Corporation v. Washington, supra, 377 U.S. at 441, 84 S.Ct. at 1568. The taxpayers have failed to make any such showing." [53 Haw. at 425, 495 P.2d at 1177]
Much the same result was achieved in McKinnis Travel Service, Inc. v. State, 78 Wash.2d 229, 472 P.2d 392 (1970), and Pan American World Airways, Inc. v. Virgin Islands, 459 F.2d 387 (3d Cir. 1972).
In Matter of Heftel Broadcasting Honolulu, Inc., 57 Haw. 175, 554 P.2d 242 (1976), cert. denied, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977), the issue was taxation *622 of the income of an out-of-State lessor derived from the leasing of television and film rights to local television stations. The taxpayer contended that all of the products covered by the license agreement were made out of state, but the court found that the license agreement gave the out-of-State lessor local dominion over the telecast which provided a sufficient nexus to permit the entire revenue from the license agreement to be subject to the Hawaii business and occupation tax.
It is obvious from these decisions, as well as from General Motors Corp. and Standard Pressed Steel, that a state tax cannot be defeated on Commerce or Due Process Clause grounds merely because the value of out-of-state activity as it relates to the subject of the tax, whether the subject be products or services, is substantially greater than the value of in-state activity.
The conclusion that must be reached is that as long as the out-of-state taxpayer is conducting relevant business activities within this State, it may be subject to a business and occupation tax on the receipts derived from the local transaction, regardless of whether those receipts substantially exceed the value of the local transactions performed by the taxpayer in this State.
The taxpayer's final point is that the City of Pittsburgh has imposed a similar tax and that the West Virginia tax thus creates a multiple burden on interstate commerce. The only pertinent evidence in the record is a statement by a partner of the taxpayer that income from West Virginia is reported to the City of Pittsburgh and that it is not possible to determine whether the tax is on income or gross receipts. Clearly, since the decisions in General Motors Corp. and Standard Pressed Steel, if not as early as North-western States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), the taxpayer cannot abstractly raise the issue of multiple taxation, but has the burden of showing how a multiple tax arises in a constitutional sense.[9] Here, there was no attempt to detail the precise nature of the out-of-state tax and its particular bearing on the transaction taxed by this State. General Motors Corp. v. Washington, supra.
Because the taxpayer failed to establish the precise nature and effect of the City of Pittsburgh tax, and thus did not meet its evidentiary burden, I would decline to resolve the issue on this ground.

IV

CAROLYN SUE STURGEON
Here, the majority fares no better than in the preceding cases in its attempt to articulate why the tax on obtaining a certificate of title, contained in W.Va.Code, 17A-3-4, is valid. It erroneously characterizes the tax as a "use" tax, which it clearly is not, and concludes that the tax is valid because the taxpayer is not involved in interstate commerce.
The tax in question cannot be termed a use tax, since that term is traditionally applied to a tax which is a complement to a sales tax and is designed to tax the use of property brought into a state which was not subject to state sales tax.
West Virginia has provisions for sales and use taxes set forth in W.Va.Code, 11-15-1, et seq., and 11-15A-1, et seq. By express legislative statement, the use tax is intended to complement the sales tax. W.Va.Code, 11-15A-1a.[10] Both the sales and use *623 taxes in W.Va.Code, 11-15-9(5), and W.Va.Code, 11-15A-3(2), specifically exempt from their scope motor vehicles which are subject to the title certificate tax.
The use tax as a counterpart to a sales tax was found to be constitutional in Henneford v. Silas Mason Co., 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937), and it is from this case that the taxpayer launches her attack. Henneford left unanswered the question of whether, if an exemption or credit is provided in the use tax for sales tax paid in the taxing state, a similar exemption must be given for sales tax paid out of state. In Henneford, because the use tax statute exempted property on which a sales tax had been paid to the State of Washington and gave the same exemption to property subjected to similar out-of-state taxes, the Supreme Court was not required to decide the issue.[11]
Paradoxically, while Henneford appears to hold that a use tax is not a tax on interstate commerce because the product has come to rest within the state and commerce is therefore at an end,[12] its discussion of the exemption issue is cast in terms of the Commerce Clause.[13] If the Commerce Clause had not been implicated in Henneford, it would be difficult to understand Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), which struck a Louisiana use tax as violating the Commerce Clause, holding:
"The conclusion is inescapable: equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state." [373 U.S. at 70, 83 S.Ct. at 1204, 10 L.Ed.2d at 207].
Halliburton involved a use tax on certain oil well equipment brought into and used within the State of Louisiana. It was shown that the use tax applied to the value of the labor costs and overhead in addition to the value of the material in the product only if the product was manufactured out of state. If manufactured within the state, the tax would only be on the value of the material and not on labor and cost of overhead. Thus, there was a clear discrimination in the application of the two taxes.
Halliburton cited Henneford, but conspicuously omitted Henneford's statement that "[t]he tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end." [300 U.S. at 582, 57 S.Ct. at 526, 81 L.Ed. at 818]. Rather, it stated: "[T]he [Henneford] court concluded: `Equality is the theme that runs through all the sections of the statute.'" [373 U.S. at 70, 83 S.Ct. at 1204, 10 L.Ed.2d at 207, quoting 300 U.S. at 583, 57 S.Ct. at 527, 81 L.Ed. at 819].
It would seem, therefore, that a use tax which is a complement to a sales tax remains *624 subject to scrutiny under the Commerce Clause if it operates against commerce in a discriminatory fashion, irrespective of the extent of local contacts the out-of-state taxpayer may have.[14]
Here, the taxpayer does not urge that the tax is discriminatory and should thus be struck under the Commerce Clause, but seeks a credit for the amount of New Jersey sales tax imposed on her purchase of an automobile while she was a resident of that state. She bases her argument on the language in Henneford quoted in Note 11, supra. As we have seen, however, the motor vehicle license tax is not the conventional use tax which operates as a counterpart of the sales tax. It is a separate and distinct tax operating on the privilege of obtaining a title certificate. Consequently, I cannot see the relevance of Henneford, nor the use and sales tax cases.[15] The statute in question does not discriminate on its face.
The fact that motor vehicles purchased in this State are exempt from both West Virginia sales and use taxes does not mean that a person bringing a motor vehicle into this State who becomes a permanent resident is discriminated against by our title certificate tax. As pointed out in Henneford, no state is required under the Commerce Clause to frame its system of taxation such that its burdens and exemptions must match identically those created by other states,[16] but it cannot create within the same individual tax framework a discriminatory scheme.
I recognize that my characterization of the tax in this case as being a non-use tax, in terms of the traditional sales-use concept, differs from the description that can be found in Nuckols v. Athey, 149 W.Va. 40, 138 S.E.2d 344 (1964).[17] I do not doubt, however, that Nuckols was correctly decided under W.Va.Code, 17A-3-4, as it then existed, since that statute contained an impermissible discrimination in favor of local business by providing that "if said motor vehicle is purchased in the State of West Virginia, so much of the purchase price. . . as is represented by the exchange of other vehicles . . . shall be deducted from the total actual price" on which the tax is levied.
The present form of W.Va.Code, 17A-3-4, does not contain the foregoing preferential language in favor of motor vehicles purchased locally, and therefore cannot be said to discriminate against interstate commerce. It is for this reason, and not because *625 commerce is at an end, that the tax is valid. Moreover, since the tax is not a use tax complementing a sales tax, there is no need to consider whether Henneford is applicable and requires that we grant a credit for the sales tax paid in another state.
The majority result is right, but is based on the wrong reasons.
NOTES
[1] The states contiguous to West Virginia all have such provisions. Ky.Rev.Stat. § 186.074 [1978]; Ohio Rev.Code Ann. § 4503.182 (Page) [1979]; Pa.Stat.Ann. tit. 75, § 1331(c) (Purdon) [1977]; and, Va.Code § 46.1-121 [1966].
[1] National Geographic Society v. California Board of Equalization, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977), one of the four "perimeter" cases selected by the majority, is of dubious value to any of the issues here presented. It involved a use tax and the narrow issue of whether the taxpayer was doing sufficient business in California to require it to collect the use tax. The Court took some care to distinguish the direct taxes case, that is, where the taxpayer pays the tax in lieu of collecting it from the customer, as in a use case. As the concurring opinion noted, the main effect of the case was to overrule Miller Bros. Co. v. Maryland, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954).
[2] Comment, State Taxation of Interstate Business: An End to the Privilege Tax Immunity, 29 Univ.Fla.L.Rev. 752 (1977); Note, State Taxation on the Privilege of Doing Interstate Business: "Complete Auto Transit, Inc. v. Brady", Boston College L.Rev. 312 (1978); Note, Taxation Constitutional Law  Application and Rejection of Per Se Unconstitutional Rule as Applied to State Taxation of Interstate Commerce "Complete Auto Transit, Inc. v. Brady", 430 U.S. 274 (1977), 9 Seton Hall L.Rev. 910 (1978).
[3] For commentaries dealing with the historical development of the Commerce Clause standard, see, e. g., Hellerstein, State Taxation of Interstate Business and the Supreme Court, 1974 Term: "Standard Pressed Steel" and "Colonial Pipeline", 62 Va.L.Rev. 149 (1976); Hellerstein, State Taxation under the Commerce Clause: An Historical Perspective, 29 Vand.L.Rev. 335 (1976); Note, Constitutional LawState Taxation of Interstate CommerceCommerce Clause Analysis, 76 W.Va.L.Rev. 380 (1974); and articles cited therein.
[4] To paraphrase the standards from 430 U.S. at 287, 97 S.Ct. at 1083, 51 L.Ed.2d at 336:

(1) "[whether] [t]he activity is . . . sufficiently connected to the State to justify a tax" [this is patently a due process factor, as is (2)]; (2) "[whether] the tax is . . . fairly related to benefits provided the taxpayer" [see, e. g., Moorman Manufacturing Company v. Bair, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978)], and the two remaining factors, which are Commerce Clause standards, (3) "[whether] the tax discriminate[s] against interstate commerce" and (4) "[whether] the tax is . . . fairly apportioned."
There is an obvious parallelism, it would seem, between (2) and (4), since if the tax fairly relates to the benefits provided the taxpayer, it may be considered as fairly apportioned.
[5] W.Va.Code, 11-13-2, et seq., imposes a business and occupation tax on the following activities: severance of coal and other natural resources; manufacturing; selling tangible property; public service or utility business; contracting; operating amusements; service business not otherwise taxed; furnishing property for hire; small loan and industrial loan business; banking and other financial business.
[6] Were the tanks constructed by Pittsburgh-Des Moines more like a piece of machinery, some argument might be made that it is not a contracting activity, but a sale of a tangible property that is involved. See Gross Income Tax Division v. Surface Combustion Corp., 232 Ind. 100, 111 N.E.2d 50 (1953), cert. denied, 346 U.S. 829, 829-30, 74 S.Ct. 51, 52, 98 L.Ed. 353, 354.
[7] Note 1 in Standard Pressed Steel Co. v. Washington Department of Revenue, 419 U.S. 560, 562, 95 S.Ct. 706, 708, 42 L.Ed.2d 719, 722 (1975), states that the amount of the tax at issue was $33,444.91. The Washington business and occupation tax rate was forty-four one-hundredths of one percent (Wash.Rev.Code, 82.04.270 (1971). Thus, the total revenue generated in sales would have been approximately $7,600,000. It would be difficult to imagine that the value of the services rendered by Standard's lone employee in the State of Washington and its engineers' cost of visiting Boeing would reach even 5% of the total sales figure.
[8] Krol, Impact of Sup. Ct.'s Nat'l Geographic Case on Use-Tax Collection Responsibilities, 47 J.Tax. 44 (1977), states in Note 1:

"At the present time gross receipts taxes are imposed on all or certain business in the following states; Alaska, Delaware, Hawaii, Indiana, Mississippi, Washington and West Virginia."
[9] The phrase "in a constitutional sense" first surfaced in the field of multiple taxation in Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 463, 79 S.Ct. 357, 365, 3 L.Ed.2d 421, 430 (1959), but its meaning was not elaborated on. It reappeared in General Motors Corp. v. Washington, 377 U.S. 436, 449, 84 S.Ct. 1564, 1572, 12 L.Ed.2d 430, 440 (1964), where the Court, after quoting the phrase, stated:

"[The taxpayer] has not demonstrated what definite burden, in a constitutional sense, the St. Louis tax places on the identical interstate shipments by which Washington measures its tax. . . ."
[10] "The legislature hereby finds and declares that it is the intent of the legislature that the use tax imposed by the provisions of article fifteen-A [§ 11-15A-1 et seq.] and the consumers sales tax imposed by the provisions of article fifteen [§ 11-15-1 et seq.], chapter eleven of the Code of West Virginia, one thousand nine hundred thirty-one, as amended, be complementary laws and wherever possible be construed and applied to accomplish such intent as to the imposition, administration and collection of such taxes."
[11] With regard to the issue, the Court stated:

"We have not meant to imply by anything said in this opinion that allowance of a credit for other taxes paid to Washington made it mandatory that there should be a like allowance for taxes paid to other states. A state, for many purposes, is to be reckoned as a self-contained unit, which may frame its own system of burdens and exemptions without heeding systems elsewhere. If there are limits to that power, there is no need to mark them now. It will be time enough to mark them when a taxpayer paying in the state of origin is compelled to pay again in the state of destination.. . ." [300 U.S. at 587, 57 S.Ct. at 529, 81 L.Ed. at 821].
[12] "The tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end.

"Things acquired or transported in interstate commerce may be subjected to a property tax, non-discriminatory in its operation, when they have become part of the common mass of property within the state of destination. . . ." [300 U.S. at 582, 57 S.Ct. at 526, 81 L.Ed. at 818].
"The tax upon the use after the property is at rest is not so measured or conditioned as to hamper the transactions of interstate commerce or discriminate against them." [300 U.S. at 583, 57 S.Ct. at 527, 81 L.Ed. at 819].
[13] See Note 11, supra.
[14] Discrimination under the Commerce Clause is not limited to the field of taxation. E. g., Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (apple grading regulation); Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976) (milk regulation). See generally Maltz, The Burger Court, The Commerce Clause, and The Problem of Differential Treatment, 54 Ind.L.J. 165 (1979); L. Tribe, American Constitutional Law (1978), p. 354, et seq.
[15] Even in those instances where the question has arisen in the traditional use and sales tax area, the courts are divided on the necessity of a credit. Compare George v. Scent, 346 S.W.2d 784 (Ky.1961), and Philco Corp. v. Department of Revenue, 40 Ill.2d 312, 239 N.E.2d 805 (1968) (requiring credit for out-of-state sales tax payment), with Atlantic Gulf & Pacific Co. v. Gerosa, 16 N.Y.2d 1, 209 N.E.2d 86, 261 N.Y.S.2d 32 (1965), and State v. Fields, 35 N.E.2d 744 (Ohio App.1938) (not requiring credit for out-of-state sales tax payment). See also Annot., Sales or Use Tax on Motor Vehicle Purchased Out of State, 45 A.L.R.3d 1270, 1277-78 (1972); Annot., Use Tax on Property Purchased by Nonresident in Another State, 41 A.L.R.2d 535 (1955); 68 Am.Jur.2d Sales and Use Taxes § 220 (1973). For a comprehensive treatment of the problem, see Comment, Compensating Use Taxes: Past and Present Constitutional Problems in Imposition and Collection, 18 Ark.L.Rev. 321 (1965).
[16] Henneford's precise language on this point is:

"A state, for many purposes, is to be reckoned as a self-contained unit, which may frame its own system of burdens and exemptions without heeding systems elsewhere." [300 U.S. at 587, 57 S.Ct. at 529, 81 L.Ed. at 821].
[17] The Court in Nuckols v. Athey, 149 W.Va. 40, 48, 138 S.E.2d 344, 349 (1964), concluded that the tax under W.Va.Code, 17A-3-4, was a use tax because the sales tax, W.Va.Code, 11-15-9(5), exempted motor vehicles. It overlooked the fact that under the use tax statute, W.Va.Code, 11-15A-3(2), motor vehicles are also exempted.