CAPITOL CABLEVISION CORP.

*v.*

DAVID C. HARDESTY, JR.

*Tax Commissioner, etc.*

(No. 15062)

Decided December 18, 1981.

*Charles W. Loeb, William D. Highland, Robert J. Kroner, Payne, Loeb & Ray,* for appellant.

*Chauncey H. Browning, Jr.*, Attorney General, *E. Wayne Basconi*, Assistant Attorney General, for appellee.

McGraw, Justice:

Capitol Cablevision Corporation appeals from the judgment of the Circuit Court of Kanawha County which affirmed the decision of the Tax Commissioner of the State of West Virginia ordering the appellant to pay business and occupation taxes. The appellant contends that the Commissioner's decision violates the equal protection provisions of the federal and state constitutions and the mandate of equal and uniform taxation contained in article 10, section 1 of the Constitution of West Virginia. We find no error in the judgment of the circuit court and we affirm the decision.

Capitol Cablevision Corporation (Capitol) is a West Virginia corporation which owns and operates a cable television system, sometimes referred to as a community antenna television system (CATV), in the cities of Charleston, South Charleston and Dunbar. Capitol, which commenced cable television operations in the spring of 1968, operates a typical CATV system. By means of a strategically located antenna, it intercepts the signals of conventional television broadcasting, amplifies them and then transmits the signals by wire or cable to the homes of subscribing viewers. The boosted signal is received only by those persons who subscribe to the CATV system service and arrives in the subscriber's home at almost the same moment it is broadcast. In this manner Capitol is able to offer its subscribers "imported" signals from distant markets which would be impossible to receive on a home antenna, as well as to boost local signals to overcome the obstacles of local terrain.

In addition, Capitol offers its subscribers certain programming not available from conventional broadcasters by means of direct transmissions from the corporation's local studio, independent of over-the-air signals, on its own "local origination" channel. Locally originated pro-

grams take two forms. First, Capitol purchases syndicated programs such as film classics and religious programs on the open market and transmits them to its subscribers on the local origination channel. Capitol also produces its own programming, such as local sports events and public service programs, and transmits it to subscribers. Both kinds of "cablecasts" are sent out over the same distribution system as the retransmitted over-the-air signals. During the tax assessment period at issue here, October 1, 1967 to September 30, 1971, Capitol performed both the function of retransmitting conventional broadcast signals and the cablecasting function.[1]

Capitol's revenues were derived principally from subscription and installation fees paid by individual viewers, all of whom live within the state. Capitol attempted to sell advertising time on its local origination channel, but advertising revenues did not form a significant part of its gross receipts. All of Capitol's equipment is located, and all of its employees work, within the boundaries of the state.

On December 19, 1972, the Tax Commissioner issued an assessment against Capitol for unpaid business and occupation taxes in the amount of $16,395.10. Added to the amount of the tax liability was a penalty of $4,169.05, for a total assessment of $20,564.15. The assessment was levied against the gross receipts of Capitol's business activities during the assessment period. After the issuance of the assessment, Capitol filed a petition for assessment with

---

[1] During the tax assessment period, Capitol offered nine cable channels to its subscribers. Four of those channels were allocated to conventional commercial broadcasters in Charleston, Huntington and Beckley. Two others carried the conventional broadcast signals of public television stations in Grandview and Huntington. One channel carried the mechanically generated signals of United Press International, which appeared on the viewer's television screen as a printout. This service was purchased by Capitol and was not available from conventional broadcasters. Another channel carried locally generated messages. The ninth channel was Capitol's local origination channel, over which most of its cablecasting activity occurred.

the Tax Department, and a hearing was held upon the petition on November 21, 1977.

At the hearing, Capitol contended that the assessment was levied against income which was a product of interstate commerce and that the imposition of the tax violated the Commerce Clause of the United States Constitution. Capitol also challenged the assessment on equal protection grounds, alleging that the Commissioner's taxation of cable television operators was disparate and discriminatory in relation to the treatment of conventional broadcasters. It was stipulated that between 1957 and 1974 it was the general policy of the State Tax Department to exempt the gross income of conventional radio and television broadcasters from the business and occupation tax on the ground that broadcasting companies were engaged in business activity that was interstate in nature.[2]

By decision dated March 2, 1978, the Commissioner affirmed the assessment of the tax, but waived the penalty. The Commissioner found that while Capitol was engaged in interstate activity insofar as it imported programming from outside the state, the totality of Capitol's revenue was derived from business activities conducted solely within the State of West Virginia. Accordingly, the Commissioner concluded that the imposition of the business and occupation tax against Capitol's gross revenue did not create a burden on interstate commerce. The Commissioner also concluded that since Capitol was not an interstate broadcaster, as were conventional broadcasters, there was no violation of the guarantee of equal protection by virtue of the disparate tax treatment.

Capitol appealed this decision to the Circuit Court of Kanawha County, which, by order filed March 20, 1980, affirmed the final decision of the Commissioner, holding

---

[2] In 1974, the Legislature amended the business and occupation tax statute to exempt for one year gross income derived from the sale of radio and television broadcasting time. *W. Va. Code* § 11-13-3(g) [1974]. In 1975, the exemption was extended indefinitely. *W. Va. Code* § 11-13-3(g) (1981 Cum. Supp.).

Capitol liable for the assessed business and occupation taxes. It is from that decision that Capitol now appeals.

Capitol's primary assignments of error are the circuit court's findings that Capitol was not engaged in interstate commerce and that the State's exemption of radio and television broadcasting revenues from the business and occupation tax did not violate the guarantee of equal protection. Capitol asserts that it is engaged in interstate commerce and that it is in the same business and offers the same product or service as do conventional broadcasters. Capitol contends that the imposition of the business and occupation tax upon its gross income for the tax assessment period in question subjected it to greater taxation than that imposed upon local broadcasters in violation of the equal protection provisions of the state and federal constitution.

There is little question that the broadcasting of radio or television signals is an activity in interstate commerce. In *Fisher's Blend Station, Inc. v. Tax Commissioner*, 297 U.S. 650, 56 S.Ct. 608, 80 L.Ed. 956 (1936), the United States Supreme Court, in striking down a state privilege tax assessed against the gross receipts, derived from the sale of air time to advertisers, of a radio broadcasting station whose signals were received by listeners in adjoining states, noted the interstate nature of broadcasting. Comparing the station's radio broadcasts to the transmission of telegraph or telephone messages across the state lines, the Court concluded that any transmission of information over state lines, including broadcasting, is a form of "intercourse" which is commerce.

> The essential purpose and indispensable effect of all broadcasting is the transmission of intelligence from the broadcasting station to distant listeners. It is that for which the customer pays. By its very nature, broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject it to the control, of the commerce clause. 297 U.S. at 655, 56 S.Ct. at 610.

*See also, Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933).

However, the mere fact that a business is engaged in interstate commerce does not in itself preclude the State from laying a tax on the privilege of doing business in the state. The Court in *Fisher's Blend, supra,* intimated that had the assessment in that case been apportioned so as to tax only the purely local revenue-generating activities of the radio broadcaster, it would have survived judicial scrutiny. The apportionment rule was succinctly stated in *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1938):

> It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business. "Even interstate business must pay its way," Postal Telegraph-Cable Co. v. Richmond, 249 U.S. 252, 259, 39 S.Ct. 265, 266, 63 L.Ed. 590; Ficklen v. Shelby County Taxing District, 145 U.S. 1, 24, 12 S.Ct. 810 [813], 36 L.Ed. 601; Postal Telegraph Cable Co. v. Adams, 155 U.S. 688, 696, 15 S.Ct. 268, 360, 39 L.Ed. 311; Galveston, H. & S.A.R. Co. v. Texas, 210 U.S. 217, 225, 227, 28 S.Ct. 638 [639, 640], 52 L.Ed. 1031, and the bare fact that one is carrying on interstate commerce does not relieve him from many forms of state taxation which add to the cost of his business.
>
> \*   \*   \*   \*   \*   \*
>
> The vice characteristic of those [local taxes measured by gross receipts from interstate commerce] which have been held invalid is that they have placed on the commerce burdens of such a nature as to be capable in point of substance, of being imposed, (citations omitted) with equal right by every state which the commerce touches, merely because interstate commerce is being done, so that without the protection of the commerce clause

it would bear cumulative burdens not imposed on local commerce. (Citations omitted.)

\*    \*    \*    \*    \*    \*

Taxation measured by gross receipts from interstate commerce has been sustained when fairly apportioned to the commerce carried on within the taxing state, (citations omitted) and in other cases has been rejected only because the apportionment was found to be inadequate or unfair, (citations omitted.). Whether the tax was sustained as a fair means of measuring a local privilege or franchise, (citations omitted) or as a method of arriving at the fair measure of a tax substituted for local property taxes, (citations omitted) it is a practical way of laying upon the commerce its share of the local tax burden without subjecting it to multiple taxation not borne by local commerce and to which it would be subject if gross receipts, unapportioned, could be made the measure of a tax laid in every state where the commerce is carried on. 303 U.S. at 254-257, 58 S.Ct. at 548-549.

The Court in *Western Live Stock* held that a privilege tax imposed on a magazine publisher measured by the gross receipts from the sale of advertising space in magazines was valid, notwithstanding the fact that the advertising contracts of the publisher involved distribution of the magazines to points outside the state. The Court held that because the business of preparing, printing and publishing the magazine advertisements was a peculiarly local activity, distinct from the circulation of the magazine, and because the tax was imposed only upon the revenue generated by that activity, the assessment was constitutionally permissible.

The principle that a state may lay a tax on the gross receipts of a business engaged in interstate commerce, so long as the tax is apportioned so that it will not discriminate against interstate commerce and will not subject the same activity to multiple taxation in other states, was applied to the broadcasting industry in *Albuquerque Broadcasting Co. v. Bureau of Revenue,* 51 N.M. 332, 184 P.2d 416 (1947). There the court held that the fact that a

local radio station broadcast national spot advertising as well as local advertising programs did not preclude the State from imposing a privilege tax, measured by the gross receipts of advertising revenue, so long as the assessment was limited to the income derived from purely local or intrastate broadcasting. *See also, Pacific Broadcasting Corp. v. Riddell,* 427 F.2d 519 (9th Cir. 1970); *McCaw v. Fase,* 216 F.2d 700 (9th Cir. 1954), *cert. denied,* 348 U.S. 927, 75 S.Ct. 340, 99 L.Ed. 727 (1955); *Greater Fremont, Inc. v. City of Fremont,* 302 F.Supp. 652 (N.D. Ohio W.D. 1968); *Evangelical Covenant Church v. City of Nome,* 394 P.2d 882 (Alaska 1964); *Lee Enterprises Inc. v. Iowa State Tax Comm'n,* 162 N.W.2d 730 (Iowa 1968); *Albuquerque Broadcasting Co. v. Bureau of Revenue,* 59 N.M. 201, 281 P.2d 654, *appeal dismissed,* 350 U.S. 806, 76 S.Ct. 73, 100 L.Ed. 724 (1955).

The United States Supreme Court recently discussed the apportionment rule in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). In that case the appellant, a Michigan corporation engaged in the business of transporting motor vehicles by motor carrier for an automobile manufacturer, challenged the imposition of a state business and occupation tax measured by the gross income of the appellant's business. Motor vehicles intended for delivery within the State of Mississippi were assembled by the manufacturer in another state and then shipped by rail to Mississippi. The vehicles were then loaded onto the appellant's trucks at the railhead and delivered to the dealers in Mississippi. The transportation company contended that, even though its operations were conducted within the borders of the state, it was a part of interstate commerce and, as such, could not be subjected to a tax on the privilege of doing business within the state. *Spector Motor Service v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951); *Freeman v. Hewitt,* 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946).

The Court in *Complete Auto Transit* reviewed its prior decisions on the issue of taxation of businesses engaged in

interstate commerce and concluded that the *Spector* rule "has no relationship to economic realities." 430 U.S. at 279. The Court expressly overruled *Spector* and enunciated the factors to be considered in determining whether the imposition of a privilege tax on a business which is a part of the interstate commerce is unconstitutional. Those factors are: (1) the tax must be imposed upon activities which have a sufficient nexus with the state; (2) the activity which the state taxes must be fairly related to the services provided by the state; (3) the tax must not discriminate against interstate commerce; and (4) the tax must be fairly apportioned. The Court, finding that the state business and occupation tax on the gross income of the appellant's business met these requirements, upheld the assessment against the appellant.[3]

CATV systems may be considered to be engaged in interstate commerce in that they serve as a link in the interstate transportation and transmission of television broadcast signals originating outside of the state. *U.S. v. Midwest Video Corporation*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972), *reh. denied* 409 U.S. 898, 93 S.Ct. 95, 34 L.Ed.2d 157 (1973); *U.S. v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *General Telephone Company v. U.S.*, 449 F.2d 846 (5th Cir. 1971); *Buckeye Cablevision Inc. v. FCC*, 128 App. D.C. 262, 387 F.2d 220 (1967); *Idaho Microwave Inc. v. FCC*, 122 App. D.C. 253, 352 F.2d 729 (1965). Although these cases, with the exception of *Buckeye Cablevision, supra*, speak in terms of "interstate communication" rather than "interstate commerce"[4], the purchase and retransmission of

---

[3] Capitol does not contend here that the imposition of the business and occupation tax does not fulfill these requirements. It merely asserts that it is engaged in interstate commerce and conducts the same kind of business as do conventional broadcasters.

[4] These cases all deal with the question of FCC jurisdiction to regulate CATV systems. The FCC's regulatory power is restricted to "interstate and foreign communication by wire or radio...." 47 U.S.C. § 152(a). Consequently, the resolution of the issue presented in these cases was dependent upon whether CATV systems engaged in interstate communication. *Buckeye Cablevision* is the only case which uses the term "interstate commerce" in relation to the activ-

broadcast signals which originate in another state is certainly "intercourse" which constitutes interstate commerce. Indeed, the Commissioner recognized that Capitol's income "is undeniably a product of interstate commerce."

However, it is equally clear that the totality of Capitol's revenue was derived from business activities which occurred wholly within the State of West Virginia. During the assessment period Capitol gleaned almost all of its income from the installation and subscription fees paid by subscribers to Capitol's cable television service. All of its subscribers lived within the state. All of its equipment, including receiving and transmitting equipment, was located here. All of its employees lived and worked here. Capitol did not transmit its signals across state lines nor did it have the capacity to do so. No significant part of the business activities which generated the revenue sought to be taxed here occurred in any other state. Capitol's operations are very similar to those of the transportation company in *Complete Auto Transit, supra,* in that they are carried on totally within the state.

The local nature of the activities of cable television systems was described in *TV Pix Inc. v. Taylor,* 304 F.Supp. 459 (D. Nev. 1969), *aff'd without opinion,* 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed. 2d 746 (1970). There, the State of Nevada sought to regulate CATV systems as public utilities. The District Court rejected the plaintiff's argument that the State was attempting to regulate a subject of interstate commerce.

> While the community antenna television business is in interstate commerce and is an integral part of interstate commerce (citation omitted), it constitutes the last stage of the interstate transmission of the television signals. It is one continuous interstate transmission to the viewer's television set, but the apparatus of the community antenna system is an appendage to the primary interstate broadcasting facilities with incidents

---

ities of CATV systems. However, there is no discussion in that case of the commerce aspect of CATV operations and the term appears to have been used as a synonym for "interstate communication."

much more local than national, involving cable equipment through the public streets and ways, local franchises, local intra-state advertising and selling of services and local intra-state collections. In this perspective a community antenna service is essentially a local business and, in its impact on interstate commerce, is analogous to a local express or parcel delivery service or a local pilotage or lighter service organized to facilitate the final interstate delivery of goods to the named consignee. Appropriate state regulation of such primarily local facilities or services in interstate commerce, in the absence of federal legislative intervention, is not proscribed by the Commerce Clause of the Constitution. (Citations omitted.) 304 F.Supp. at 463.

From this discussion we conclude that a corporation such as a cable television system, which is an integral part of interstate commerce, but which derives its gross income from business activities conducted wholly within the borders of the state, is liable for payment of the state business and occupation tax measured by 100% of the gross West Virginia receipts of such corporation. Businesses whose gross income is derived from activities conducted both within and without the state may be subject to tax liability so long as the assessment of the tax is apportioned to the percentage of the activity that occurs locally and the imposition of the tax does not present a danger of multiple taxation of the same activity by other states.

Capitol asserts, however, that if this is true, then there is no valid reason for the different treatment accorded conventional broadcasters. It asserts that it is in the same business as and is in competition with local broadcasters and should, therefore, be exempted, as are conventional broadcasters, from payment of the business and occupation tax under the constitutional guarantee of equal protection.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not

imposed on others of the same class," the right implicated being "the right to equal treatment." *Township of Hillsborough v. Cromwell*, 326 U.S. 620, 623, 66 S.Ct. 445, 448, 90 L.Ed. 258, 263 (1946). Substantially similar protection is afforded by West Virginia Constitution article 10, section 1, which provides in pertinent part that "taxation shall be equal and uniform throughout the state," which means that "the rate of taxation must be uniform and equal within the classification." *Arslain v. Alderson*, 126 W. Va. 880, 888, 30 S.E.2d 533, 537 (1944).

The constitutional requirement of equal and uniform taxation means that as to classes of property, businesses, or incomes there shall be uniformity of taxation and a tax upon all businesses of the same class, which is uniform as to that class of business, is not unconstitutional. *In re Hancock County Federal Savings & Loan Assn.*, 112 W. Va. 426, 25 S.E.2d 543 (1943); *Christopher v. James*, 122 W. Va. 665, 12 S.E.2d 813 (1941); *Charleston & S. Bridge Co. v. Kanawha County Court*, 41 W. Va. 658, 24 S.E. 1002 (1896). Courts have implemented this rule of equal treatment by invalidating taxes falling unequally on business competitors who make the same product or offer the same service. *See. e.g., Washington Theater Club, Inc. v. District of Columbia*, 311 A.2d 492 (D.C. App. 1973); *City of Louisville v. Koehler*, 264 S.W.2d 80 (Ky. 1954); *Beauty Built Construction Corp. v. City of Warren*, 375 Mich. 229, 134 N.W.2d 214 (1965); *Airway Drive-in Theater Co. v. City of St. Ann*, 354 S.W.2d 858 (Mo. 1962); *Opinion of the Justices*, 118 N.H. 343, 386 A.2d 1273 (1978); *Gilbert v. Town of Irvington*, 20 N.J. 432, 12 A.2d 114 (1956); *Commonwealth v. Staley*, 476 Pa. 171, 381 A.2d 1280 (1978). *See generally*, Annots., 99 A.L.R. 703 (1935); 43 A.L.R. 592 (1926). In all of these cases, the court struck down the tax because it found no substantial difference between businesses as to the product offered or the service rendered, and concluded, expressly or impliedly, that the tax had the effect, if not the purpose, of stifling competition or, conversely, of favoring one competitor over the other. Where, however, the similarity between two businesses is only superficial and they make different products or perform different services, differen-

tial treatment in tax assessment will be upheld. *See, e.g., Heisler v. Thomas Colliery Co.*, 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237 (1922);*Klein v. Hulman*, 34 Ill.2d 343, 215 N.E.2d 268 (1966); *Peoples Gas Light & Coke Co. v. City of Chicago*, 9 Ill.2d 348, 137 N.E.2d 330 (1956).

We are of the opinion that CATV systems and conventional television broadcasters do not offer the same product or service.

> The dictionary defines the verb "broadcasting" as "to make *widely known*: to disseminate or distribute widely or at *random* . . . to send out from a transmitting station (a radio or television program) for an *unlimited* number of receivers," and the adjective "broadcast" as "made *public* by means of radio or television." (Emphasis added.) Webster's Third New International Dictionary 280.

*Winchester TV Cable Co. v. State Tax Commissioner*, 216 Va. 286, 290-291, 217 S.E.2d 885, 889 (1975). The Federal Communications Act of 1934, which vested the Federal Communications Commission with the authority to regulate the broadcasting industry, defines broadcasting as "the dissemination of radio communications intended to be received by the public. . . ." 47 U.S.C. § 153(o)[5]. A broadcaster transmits its television signal into space to be received, without charge, by any member of the public within range of the signal and equipped with a receiver capable of translating the signal into pictures and sound. *See Winchester TV Cable Co. v. State Tax Commissioner.* The broadcaster is in the business of selling air time to advertisers who will pay for the broadcasts in return for having their advertising messages transmitted to the public at large. The broadcaster's over-the-air signal can be received on only one frequency and once the signal is transmitted, the broadcaster has no control over where or how far it goes or who receives it.

---

[5] 47 U.S.C. § 153(b) (1970) defines "radio communications" to include the transmission of pictures. *Home Box Office Inc. v. FCC*, 185 App. D.C. 142, 567 F.2d 19, *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

CATV systems are vastly different enterprises. The CATV operator transmits captured broadcast signals through privately-owned cable or wire only to those persons who have paid for the service. The CATV system is in the business of selling television viewers enhanced reception of local broadcast signals and a wider range of programming from imported broadcast signals. The CATV operator controls the direction and distance of its signal, as well as those who receive it.

In essence, television broadcasters are in the business of generating and transmitting broadcast signals to the general public, while CATV system operators are in the business of enhancing and facilitating reception of those signals. *See Winchester TV Cable Co. v. FCC*, 462 F.2d 115 (4th Cir. 1972). *Cf. Teleprompter Corp. v. Columbia Broadcasting Systems, Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390. 88 S.Ct. 2084, 20 L.Ed.2d 1176, reh. denied, 393 U.S. 902, 89 S.Ct. 65, 21 L.Ed.2d 190 (1968) (in the area of copyright law). The service offered by the CATV system operator is not unlike that which the individual viewer renders himself when he erects a television antenna on the roof of his house. The purpose of the activity is not to generate new signals but to increase the ability of the viewer to receive existing signals.

It is true that Capitol also provided, during the assessment period in question, programming on its local origination channel which was locally produced in its own studios as well as programs purchased on the open market which were not available from local broadcasters. Capitol asserts that by offering this service, it was in fact engaging in the business of broadcasting. We cannot support this conclusion. Capitol is essentially in the business of delivering television broadcast signals generated by others to its subscribers. The signals Capitol generated were transmitted only to those persons who subscribed to the "delivery" service. The local programming was not intended to be received by the public at large, but only by those persons who paid for Capitol's service. *Cf. KMLA*

*Broadcasting Corp. v. 20th Century Cigarette Vendors Corp.,* 264 F.Supp. 35 (C.D.Cal. 1967) (subscription television service).

Finally, we agree with Capitol's contention that it competed with local broadcasters for the attention of viewers during the assessment period in that it offered a broader spectrum of programming from which the local television viewer could choose, thus dividing the audience of local broadcasters.[6] It can hardly be ignored, however, that Capitol and local broadcasters complemented each other at the same time. Capitol amplified and carried the signals of local broadcasters into homes which would otherwise have been unable to receive them, and a certain part of the viewer's attraction to Capitol's service stemmed from the fact that Capitol relayed the boosted signals of local broadcasters. What Capitol characterizes as competition with local broadcasters may be more accurately characterized as a symbiotic relationship. Moreover, there was practically no competition whatever between Capitol and the local broadcasters for the income sought to be taxed in this case.

We conclude, therefore, that for purposes of imposing the business and occupation taxes, cable television systems are not engaged in the business of "broadcasting" as are conventional television broadcasters. While CATV systems may possess some of the characteristics of a television broadcaster, they also may be characterized as common carriers, akin to a telephone or telegraph company, having all of the characteristics of neither a broadcaster nor a common carrier. *See U.S. v. Southwestern Cable, Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).[7] Cable

---

[6] *See, e.g., U.S. v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *Carter Mountain Transmission Corp. v. FCC,* 116 App.D.C. 93, 321 F2d 359, *cert. denied,* 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963).

[7] It is interesting to note that neither U.S. v. Southwestern Cable Corp., supra, nor *U.S. v. Midwest Video Corp.* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390, *reh. denied,* 409 U.S. 898, 93 S.Ct. 95, 34 L.Ed.2d 157 (1972), which held that the Federal Communications Commission had jurisdiction to regulate CATV systems in the exercise of its

television systems are engaged in a business of a unique nature and the State may enforce a different taxing policy on such systems than it does on conventional television broadcasting companies without violating the constitutional guarantees of equal protection or of equal and fair taxation. Consequently, the judgment of the Circuit Court of Kanawha County, which affirmed the decision of the Tax Commissioner of the State of West Virginia, ordering Capitol Cablevision Corporation to pay business and occupation taxes in the amount of $16,395.10, is affirmed.

*Affirmed.*

---

regulatory authority over broadcasters, equated CATV systems with broadcasting. Rather, the Court found that CATV systems were an "auxiliary" of the television broadcasting industry and that the FCC had jurisdiction to regulate them only insofar as it was necessary to insure the agency's performance of its responsibilities for regulating broadcasters.