363 S.E.2d 477

**UNITED ENGINEERS & CONSTRUCTORS, INC.**

v.

**Herschel H. ROSE, III, State Tax Commissioner.**

**No. 17322.**

Supreme Court of Appeals of West Virginia.

Nov. 17, 1987.

Louis S. Southworth, II, James R. Snyder, Jackson, Kelly, Holt & O'Farrell, Charleston, for United Engineers.

Mary Carol Holbert, Att'y Gen., Tax Div., for Rose.

NEELY, Justice:

In 1979 the State Tax Commissioner assessed United Engineers & Constructors, Inc. ("United") $665,036.45 in back taxes plus $806.05 interest and $219,667.17 in penalties. United petitioned for reassessment and, in 1982, the tax commissioner affirmed the assessment but waived the penalties. The central question before the commissioner and in the lower court on appeal from the commissioner's decision was whether the gross receipts earned by United from engineering and design services ancillary to United's activities as a contractor in West Virginia but performed in Pennsylvania and Massachusetts were properly subject to the West Virginia Business and Occupation Tax.

The tax commissioner determined that engineering and design services performed in Pennsylvania and Massachusetts were an integral part of United's contracting business in West Virginia, and in 1985, the Circuit Court of Kanawha County affirmed the tax commissioner's decision. We granted United's appeal to determine whether the decisional law of the United States Supreme Court since we wrote *Pittsburgh–Des Moines Steel Co. v. Goodwin*, 164 W.Va. 525, 264 S.E.2d 604 (1979), compels a different result in this case than we reached in *Pittsburgh–Des Moines.* We find no change in the federal law since 1979 that would disturb our holding in *Pittsburgh–Des Moines;* therefore, we affirm the circuit court.

United is a Delaware corporation qualified to do business in West Virginia that provides engineering, design and construction services. During the audit period—the years 1974 through 1978—United performed services for member companies of the Allegheny Power System under two contracts. Under an agreement dated 1 August 1974, United contracted with Monongahela Power Company, the Potomac

Edison Company, and West Penn Power Company to provide engineering, design and construction management services and to perform such construction work as needed for two generating units at the Pleasants Power Station. By a separate agreement, United contracted with Monongahela Power Company to provide engineering and design services and to perform such construction work and construction management services as needed to modify an existing coal handling system at Monongahela's Willow Island Power Station.

United's business is divided into two categories: (1) engineering and design services and (2) construction services. United is composed of four engineering divisions and one construction division. Each division is a separate unit for financial, accounting, and personnel purposes. Furthermore, each division is a separate profit center, having a vice-president who reports directly to the president of the company. The divisions operate independently. United customarily offers its engineering services and construction services separately. In 1978, for example, United had 151 contracts for engineering services only, 16 contracts for construction services only, and 41 contracts for both engineering and construction services.

In the case before us United offered and contracted for its engineering services and construction services separately. Its proposal letter set out the various fees that would apply if the power companies required only engineering services, only construction services, or both. Nevertheless all United's responsibilities for various services were reflected in a single contract for both projects, although each service was set forth in a separate provision.

During the audit period United's gross receipts from both contracts were $121,-097,314.13. Of this, $26,123,482.85, or approximately 18 percent, was for design and engineering services. The remainder was for construction and construction management activities. The amount received for construction activities was reported by United under the contracting classification of our business and occupation (B & O) tax.

The amount that was received for construction management services was reported under the service classification. The tax commissioner determined that the construction management activity was so intertwined with the contracting as to be inseparable from it and reclassified this income to the contracting classification. United admitted that this was a factual question and, based on the tax commissioner's administrative decision, conceded the issue on appeal to the circuit court.

The engineering and design services, however, are still at issue in this case. Because the engineering and design services took place outside West Virginia, United did not consider gross receipts from these out-of-state services to be subject to the West Virginia B & O tax. The tax commissioner disagreed and determined not only that these receipts were subject to the B & O tax, but also that they should be taxed in the contracting category rather than in the service category.

United became involved in these two West Virginia projects in 1972 when Allegheny Power System invited United to submit a proposal to design, engineer and construct a three unit power station at a site yet to be selected in Pennsylvania or West Virginia. After extended discussion, United's Philadelphia office submitted to Allegheny Power System at its Greensburg, Pennsylvania office a proposal to provide engineering and design services, construction management services, and construction services on the project. This proposal permitted the power companies to elect to employ United's design services alone or both its design and construction services, and set forth alternative fees depending upon which alternative was selected.

Throughout the contract negotiations, all correspondence and discussion took place at Allegheny Power System's offices, either in New York or Greensburg, or at United's home office in Philadelphia. Meanwhile, in January, 1974 United submitted a proposal to perform design and engineering services, construction management services, and construction services on proposed plant modification at the Willow

Island Power Station. Monongahela Power Company hired United to provide, as separate services, engineering and design services, construction management services, and construction services as needed to modify an existing coal handling system at its Willow Island Power Station, but to provide only construction management services with regard to new structures that were to be engineered and designed by others. These agreements were executed by United at its Philadelphia office and by the power companies at their Greensburg, Pennsylvania office. Both agreements specified that the engineering and design services were to be performed by United at its home office in Philadelphia and its engineering office in Boston. It was also agreed that title to all engineering and design drawings would pass to the power companies at their Greensburg office upon completion of this section of the contract.

Although there were many phases to the engineering and design services performed by United, none of those phases was performed in West Virginia. All engineering work was performed by United either in Philadelphia or Boston. Aerial photographs of the site, from which United prepared a location report in Pennsylvania, were taken and provided by the power companies. The power companies retained an independent contractor to drill test holes in the field, and United did not supervise or participate in that drilling, although it did retain an independent consultant to examine the core borings obtained. The environmental impact statement was prepared in Pennsylvania based almost entirely on information gathered by the power companies and their agents, not by United. With respect to engineering and design services relating to the Pleasants Power Station, the tax commissioner in his administrative decision states that "the engineering division was also involved in preparing thermodynamic calculations for the environmental statement. This engineering, along with all other engineering, was performed by personnel at Philadelphia, Pennsylvania and Boston, Massachusetts."

Contacts with West Virginia by United's engineering division were minimal and merely incidental to their performance of engineering services in Pennsylvania and Massachusetts. The engineering division did not maintain an office at the job site, or anywhere else in West Virginia. Contacts by United's engineering division were limited to preliminary visits by marine biologists and visits by design engineers for project review meetings. Other visits to the site by design engineers were unusual and occurred only when revisions to the plans could not be accomplished in Philadelphia or Boston.

United did not consider receipts from the design and engineering services to be subject to the West Virginia B & O Tax. Its method of reporting for B & O Tax purposes had been audited by the State Tax Department for the years 1965 through 1969. During that period, as during the period at issue in this case, united performed engineering services at its Philadelphia and Boston offices in conjunction with a construction project in West Virginia. In that audit, United's exclusion of gross receipts attributable to engineering and design services was accepted. There were no relevant changes in the B & O Tax statute or regulations between 1969 and the period at issue here.

## I

The basic question on this appeal is whether design and engineering services performed out-of-state as an integral part of a construction contract to be performed in West Virginia are so related to the business of contracting that they may be taxed under the contracting provisions of our Business & Occupation Tax, *W. Va. Code,* 11–13–2e [1971].[1] In this regard the issue presented here is almost entirely congruent with the issue presented in *Pittsburgh–Des Moines Steel Co. v. Goodwin, supra. Pittsburgh–Des Moines* was an appeal by a taxpayer from a circuit court ruling that the taxpayer, a Pennsylvania corporation

---

1. This section has now been repealed but the original statute may be found either in older volumes of the *Code* or in *Acts of the Legislature,* Regular Session, 1971, Chapter 169.

with principal offices in Pittsburgh, was liable for tax on the fabrication and erection of certain structures in West Virginia. The taxpayer had been engaged in the design, engineering, fabrication and installation of large steel structures, including elevated water storage tanks and flat bottom storage tanks. In most instances the steel structures were fabricated in Pennsylvania and delivered by the taxpayer to West Virginia where they were erected on foundations built by the taxpayer who had selected sub-contractors. In those instances where the steel structures were fabricated out-of-state and erected on the foundations built by others, the taxpayer believed no Business and Occupation Tax was due.

The issue in *Pittsburgh–Des Moines* was whether the State could tax gross receipts on the entire contract price for designing, fabricating, and erecting storage tanks for West Virginia customers when the actual manufacture of the pre-fabricated parts of the tanks was carried on outside of West Virginia and the structure was shipped in pieces to be erected in this State. We held that it could.

In *Pittsburgh–Des Moines* the majority opinion said:

> ... furthermore, all construction in West Virginia involves the assembling of parts manufactured outside of the State of West Virginia. While the prefabrication of the storage tank out-of-state to be assembled in West Virginia is a spectacular example of out-of-state parts being assembled by a contractor, nonetheless, most of the toilets, hardware, kitchen equipment, carpet, windows, and heating systems installed in buildings constructed in West Virginia had been manufactured elsewhere.

164 W.Va. at 534, 264 S.E.2d at 610. In a separate, concurring opinion, Justice Miller pointed out that *Pittsburgh–Des Moines* was similar to *Dravo Contracting Co. v. James,* 114 F.2d 242 (4th Cir.1940), *cert. denied,* 312 U.S. 678, 61 S.Ct. 450, 85 L.Ed. 1117 (1941) in which a dam contractor contended that certain fabricating work was completed in Pennsylvania before the material was brought into West Virginia and,

therefore, that it was not subject to the West Virginia tax. Nonetheless, the federal court held that out-of-state fabrication was not a sufficient reason to escape the tax. The concurring opinion in *Pittsburgh–Des Moines* quoted *Dravo* to the following effect:

> "The tax here is not upon a unitary enterprise conducted in several states, but upon the business of contracting conducted in West Virginia, and income derived from that business is properly subject to taxation by that state.... The fact that the contractor may have prepared materials in other states for use under the contract is immaterial, if they were used in the performance of the contract in West Virginia and payments made the contractor were dependent upon such use." [114 F.2d at 246].

■ In applying *Dravo* and *Pittsburgh–Des Moines* to the case before us we adopt the findings of fact of the learned circuit court who said:

> "Plaintiff performed two projects in West Virginia during the period in question. Each project was performed under a single contract. Signing a contract encompassing all phases of a project indicates that the parties contemplated a single project, not a series of smaller projects encompassed in a single agreement. Design, engineering and construction must be considered together.

> "Plaintiff's activity falls within the definition of 'contracting.' It includes the furnishing of work and materials in fulfillment of a contract for the construction of a new building or structure. This is clearly a contracting activity. Design and engineering are clearly a part of the contracting work, and are taxable at the contracting rate. [Citations omitted] Design and engineering, when performed as an integral part of the contracting activity, are taxable at the contracting rate."

## II

Having decided that the assembling of different components—whether they be prefabricated steel structures, materials and appliances to be installed in new build-

ings, or engineering and design services—is at the very heart of the activity of "contracting" under our State tax law, it remains for us only to determine whether anything in our law runs afoul of either the commerce or due process clauses of the *Constitution of the United States.* The taxpayer asserts that by imposing the B & O Tax upon the gross income derived from its contracting activities in West Virginia, including its design and engineering work, the tax commissioner has discriminated against interstate commerce, and violated the fair apportionment and fair relationship requirements of the commerce and due process clauses of the *Constitution of the United States.* The taxpayer argues that West Virginia's B & O Tax taxes the unitary business of "contracting" and "design and engineering service." In fact, however, the only activity being taxed here is that of *contracting,* which occurs *wholely within this State.*

The plaintiff initially argues that taxation of the entire gross receipts from its contracting activity in West Virginia violates the commerce clause by discriminating against interstate commerce. Taxpayer asserts that in this regard the State has violated the "internal consistency" test set forth by the United States Supreme Court.

█ When originally articulated, the "internal consistency" test was applied only to cases involving the interstate apportionment of net business income. *See Container Corp. of America v. Franchise Tax Board,* 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). The internal consistency test is satisfied if the state tax, were it to be applied by every jurisdiction, creates no impermissible interference with free trade. This test was first applied to a gross receipts tax in *Armco, Inc. v. Hardesty,* 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984), a case arising under the West Virginia Business & Occupation Tax. Since *Armco,* it has also been applied in *American Trucking Assns., Inc. v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) and *Tyler Pipe Industries, Inc. v. Washington Department of Revenue,*

483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987).

In its brief before this court, the taxpayer makes the following argument for its position that the internal consistency rule was violated by the commissioner:

If Pennsylvania had an identical taxing structure to West Virginia, the engineering and design work performed by United in Pennsylvania, would be subject to tax in the contracting or services category. Likewise, the State of West Virginia asserts in this case that 100 percent of the design and engineering work is also taxable by this State in the contracting category. This means that gross receipts from the same activity, design and engineering, would have been taxed twice. However, a West Virginia company performing the exact same services wholly within West Virginia is taxed only once.

The taxpayer is correct that if West Virginia taxed design and engineering services performed in this state for use on out-of-state contracts the internal consistency rule would be violated. However, West Virginia does not tax design and engineering services performed here as integral parts of out-of-state contracts under *Code,* 11–13–2e [1971]. Thus, if Pennsylvania had *the exact same tax system* as West Virginia, the engineering work performed by United in Pennsylvania would *not* be taxed. If we were a Pennsylvania court applying our tax laws to these facts as if they were the Pennsylvania tax laws, the engineering and design work done in Pennsylvania would not be taxed at all.

Even when design and engineering are not furnished as part of a contracting activity, but rather as separate services, West Virginia considers the activity taxable where the service is delivered—in the case of a construction project—where the construction is being conducted. This is clear from *Richardson, Gordon and Associates v. Hardesty,* 164 W.Va. 525, 264 S.E.2d 604 (1979). As we said in *Richardson, Gordon:*

... Notwithstanding doctrinal variations, and assuming that nexus require-

ments have been satisfied, over the past four decades gross receipt taxes on interstate sales have generally been sustained when imposed by the state to which the goods were shipped and prohibited when imposed by the state from which the goods were sent.

In support of this broad proposition, the *Richardson, Gordon* court cited Hellerstein, "State Taxation of Interstate Business and the Supreme Court," 62 *Va.L.Rev.* 149, 171 (1976). *Evco. v. Jones,* 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972); *General Motors Corp. v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964); and *Gwin, White & Prince, Inc. v. Henneford,* 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272 (1939).

▉ Consequently, by the logic of *Richardson, Gordon,* and the authorities cited in that case, West Virginia would tax the engineering and design work only if the site of the project to which they were related were located in this state. If the design and engineering work were part of a construction contract, as is the case here, the tax would be levied under the contracting classification in the state where the construction took place. Thus, the activity would be taxed only once, by the state where the contracting activity culminates in the construction of the project.

### III

The taxpayer also challenges the lower court's ruling on the grounds that West Virginia's B & O Tax on contracting, as applied to this taxpayer, violates commerce clause concepts of fair apportionment. Yet as recently as 23 June 1987 the U.S. Supreme Court upheld Washington's unapportioned gross receipts tax in the face of a similar challenge by a taxpayer who alleged that Washington's Business & Occupation Tax did not fairly apportion the tax burden between its activities in Washington and its activities in other states. In *Tyler Pipe Industries, Inc., v. Washington Department of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), the taxpayer argued that the value of the wholesale transaction was partly attributable to

manufacturing activity carried on in another State, and should be apportioned accordingly. The Supreme Court focused on this apportionment argument, and concluded:

Tyler also asserts that the B & O tax does not fairly apportion the tax burden between its activities in Washington and its activities in other States. *See Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 285 [97 S.Ct. 1076, 1082, 51 L.Ed.2d 326] (1977). Washington taxes the full value of receipts from in-state wholesaling or manufacturing; thus, an out-of-state manufacturer selling in Washington is subject to an unapportioned wholesale tax even though the value of the wholesale transaction is partly attributable to manufacturing activity carried on in another State that plainly has jurisdiction to tax that activity. This apportionment argument rests on the erroneous assumption that through the B & O tax, Washington is taxing the unitary activity of manufacturing and wholesaling. We have already determined, however, that the manufacturing tax and wholesaling tax are not compensating taxes for substantially equivalent events in invalidating the multiple activities exemption. Thus, the activity of wholesaling—whether by an in-state or an out-of-state manufacturer—must be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax. *See Moorman Mfg. Co. v. Blair,* 437 U.S. [267], at 280–281 [98 S.Ct. 2340, at 2348, 57 L.Ed.2d 197 (1978)] (gross receipts tax on sales to customers within state would be 'plainly valid'); *Standard Pressed Steel Co. v. Washington Revenue Dept.,* 419 U.S. [560], at 564 [95 S.Ct. 706, at 709, 42 L.Ed.2d 719 (1975)] (selling tax measured by gross proceeds of sales is 'apportioned exactly to the activities taxed').

In the case before us, as in *Tyler Pipe,* the taxpayer is resting its argument on the erroneous assumption that the West Virginia Business & Occupation Tax taxes the unitary activity of (1) design and engineering, and (2) contracting. This is not, how-

ever, a unitary activity. Furthermore, the B & O Tax on services, *W. Va. Code*, 11–13–2h [1971] and the B & O Tax on contracting, *W. Va. Code*, 11–13–2e [1971] are not compensating taxes, any more than Washington's taxes on manufacturing and wholesaling are compensating taxes. Although in *Tyler* the taxpayer made the argument that out-of-state manufacturing contributed to the value of the wholesale transaction, the supreme court determined that the activity being taxed by Washington was that of wholesale sales, which occurred wholly within the State of Washington.

The argument can be made that because of the peculiar language of *W. Va. Code*, 11–13–2h [1971] which says: "Upon every person engaging or continuing within this State in any service business or calling not otherwise specifically taxed under this law, there is likewise hereby levied ..." a person doing design work in West Virginia that is related to an out-of-state construction contract might be taxed under this catchall section. Yet we held in *Koppers Co. v. Dailey*, 167 W.Va. 521, 280 S.E.2d 248 (1981) that where a taxpayer is engaged in furnishing work or work and material for the construction, alteration, repair, decoration or improvement of a new or existing building or structure or for furnishing work or work and materials for the alteration, improvement or development of real property, such taxpayer is engaged in the business of contracting and liable for business and occupation tax at the contracting rate contained in *Code*, 11–13–2e [1971] rather than the service rate contained in *Code*, 11–13–2h [1971].

■ Admittedly, the Business and Occupation Tax article of our *Code* was drafted before *Armco, supra;* in earlier years, before *Richardson, Gordon, supra,* and *Armco,* the state tax commissioner might, indeed, have attempted to tax those performing design and engineering services in this state for delivery out-of-state under the catchall service section. However, *Koppers, supra,* clearly indicates that what the taxpayer did in this case is "contracting." Consequently, an in-state tax-

payer doing exactly what United did in providing design and engineering service must either be taxed in the contracting category or exempted from tax on interstate commerce grounds. *Richardson, Gordon, supra,* holds that such a taxpayer is taxed in the state where the contracting site is located and exempted from the contracting tax in any other state where part of the work may be performed. Thus we hold that taxpayers performing design and engineering work in West Virginia in furtherance of out-of-state construction contracts cannot be taxed here under the contracting category, and because they are exempted from paying tax in the contracting category by virtue of the rules set forth in *Richardson, Gordon,* it would confound *Armco, supra,* if they were then taxed in the service category. To the extent that the *Code*, 11–13–2e and 11–13–2h, standing alone, may have been unclear, this ruling brings our tax structure clearly within the Supreme Court's holding in *Tyler Pipe, supra.*

■ Similarly, in the case before us, although the design and engineering work that occurred out-of-state may have contributed to the value of the contracting activity in West Virginia, the *activity* being taxed in West Virginia was *contracting,* and that occurred entirely within the State of West Virginia. The taxpayer in the case before us derives the gross receipts taxed here from business activities (i.e. contracting) conducted wholly within the borders of West Virginia. The design and engineering work, like the supply of materials, fabricated parts or fixtures from out-of-state, is furnished in the fulfillment of a contract for the construction, alteration, repair, decoration, or improvement of a new or existing building or structure in West Virginia. Consequently, the entire gross receipts should be used as the measure for the B & O Tax under the contracting classification. *See Capitol Cablevision Corp. v. Hardesty,* 168 W.Va. 631, 285 S.E.2d 412 (1981).

For the reasons set forth above, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

McHUGH, Justice, concurring:

My primary reason for concurring in a separate opinion is to note my continuing concern regarding the "internal consistency" test mentioned in syllabus point 2 of the majority opinion and discussed in section II of the body thereof.

Near the beginning of section II of the majority opinion the Court recognizes that the "internal consistency" test was originally applied by the Supreme Court of the United States only in cases involving the apportionment of interstate net income. The "internal consistency" test was first applied, as a discrimination-against-interstate-commerce test, to invalidate a so-called gross receipts tax in *Armco, Inc. v. Hardesty*, 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984) (8–1 decision). Subsequently it has been applied, as a discrimination test, to invalidate a motor vehicle marker fee and an axle tax in *American Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) (5–4 decision); and, as a discrimination test, to invalidate a so-called gross receipts tax in *Tyler Pipe Industries, Inc. v. Washington Department of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) (6–2 decision; O'Connor, J., concurring, did not read majority opinion as extending internal consistency test to taxes not facially discriminatory).

For the reasons stated by then Associate Justice Rehnquist in his dissenting opinion in *Armco* and by Justice Scalia, joined by Chief Justice Rehnquist, in section I of their opinion concurring in part (on a different issue) and dissenting in part (on the discrimination issue) in *Tyler Pipe Industries*, I believe that the use of the internal consistency test in any case other than one involving the apportionment of a net income tax is improper and adds much confusion to an already complicated area of the law.

The aforementioned dissent in *Armco* contains this insightful summary of the impropriety of applying the internal consistency test to the West Virginia business and occupation tax, a so-called gross receipts tax:

[A]ppellant has not demonstrated that it in fact has a higher tax burden in West Virginia solely by reason of interstate commerce. The Court sidesteps that fact, however, by borrowing a concept employed in our net income tax cases. Under that line of cases a state tax must have an *internal consistency* that takes into consideration the impact on interstate commerce if other jurisdictions employed the same tax. See *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 169 [, 103 S.Ct. 2933, 2942, 77 L.Ed.2d 545, 556] (1983). It is perfectly proper to examine a State's net income tax system for hypothetical burdens on interstate commerce. Nevertheless, that form of analysis *is irrelevant to examining the validity of a gross receipts tax system* based on manufacturing or wholesale [or contracting] transactions. *Where a State's taxes are linked exactly to the activities taxed*, it should be *unnecessary to examine a hypothetical taxing scheme* to see if interstate commerce would be unduly burdened.

*Armco*, 467 U.S. at 648, 104 S.Ct. at 2625, 81 L.Ed.2d at 549 (emphases added). Stated another way, there is, as a matter of logic, no concern about internal consistency among jurisdictions where, as with gross receipts taxes, only one jurisdiction has the power to tax a particular activity.

Similarly, the opinion dissenting on the discrimination issue in *Tyler Pipe Industries* distinguishes between activity-based taxes, such as the business and occupation tax of the State of Washington involved there, and net income taxes:

[W]hen more than one State has taxing jurisdiction over a multistate enterprise, an inconsistent apportionment scheme could result in taxation of more than 100 percent of that firm's net income. Where, however, tax is assessed not on unitary income but on *discrete events* such as sale, manufacture, and delivery, which can occur in a single State or in different States, that apportionment principle is not applicable; there is simply no unitary figure or event to apportion.

*Tyler Pipe Industries,* 483 U.S. at 256, 107 S.Ct. at 2824–25, 97 L.Ed.2d at 219 (emphasis added).

The standard for discrimination against interstate commerce utilized by the Supreme Court of the United States in *Armco, American Trucking Associations* and *Tyler Pipe Industries* "has no basis in the Constitution, and is not required by our past decisions." *Tyler Pipe Industries,* 483 U.S. at 254, 107 S.Ct. at 2823, 97 L.Ed.2d at 218 (Scalia, J., dissenting on this issue, joined by Rehnquist, C.J.). I would concur also with the following remarks of the dissenters in *Tyler Pipe Industries:*

> The Court's presumed basis for creating this ["internal consistency" discrimination] rule now, 198 years after adoption of the Constitution, is that the reasoning of *Armco* requires it. In my view, however, that reasoning was dictum, which we should explicitly reject....
>
> ....
>
> ... To expand that brief discussion [in *Armco* ] into a holding that internal consistency is always required, and thereby to revolutionize the law of state taxation, is remarkable.
>
> Rather than use isolated language, written with no evident consideration of its potential significance if adopted as a general rule, to overturn a lengthy list of settled decisions, one would think that we would instead use the settled decisions to limit the scope of the isolated language. As the cases from the past few Terms indicate, the internal consistency test invalidates a host of taxing methods long relied upon by the States and left unhampered by Congress....
>
> ....
>
> It seems to me that we should adhere to our long tradition of judging State taxes on their own terms, and that there is even less justification for striking them down on the basis of assumptions as to what other States *might* do than there is for striking them down on the basis of what other States *in fact* do.... Evaluating each State's taxing scheme

on its own gives this Court the power to eliminate evident discrimination, while at the same time leaving the States an appropriate degree of freedom to structure their revenue measures. Finer tuning than this is for the Congress.

*Tyler Pipe Industries,* 483 U.S. at 254–259, 107 S.Ct. at 2824–26, 97 L.Ed.2d at 219–21 (citation omitted).

Justice O'Connor in her dissenting opinion in *American Trucking Associations,* joined by Chief Justice Rehnquist and Justice Powell, who authored *Armco,*[*] made the following observations with which I would concur:

> Nor do I read *Armco* as establishing a grandiose version of the 'internal consistency test' as the constitutional measure of all state taxes under the Commerce Clause.... Creating an 'internal consistency' rule of general application is an entirely novel enterprise that the Court undertakes for the first time in this case [and in *Tyler Pipe Industries* decided the same day]. Yet the Court gives no reason why such a rule is necessary or desirable, nor does it discuss the views of the lower courts or commentators. Indeed, the limited scholarly work on general application of the internal consistency test is largely negative. *See, e.g.,* Judson & Duffy, An Opportunity Missed: *Armco, Inc. v. Hardesty,* A Retreat From Economic Reality in Analysis of State Taxes, 87 W.Va.L.Rev. 723, 739–740 (1985); Lathrop, *Armco*—A Narrow and Puzzling Test for Discriminatory State Taxes Under the Commerce Clause, 63 Taxes 551, 557 (1985). I am simply unwilling to follow the Court down this path without some greater understanding of the need, and authority, for doing so.

*American Trucking Associations,* 483 U.S. at 302–303, 107 S.Ct. at 2850–51, 97 L.Ed.2d at 255–56.

As the dissenting opinions in *Armco, American Trucking Associations* and *Tyler Pipe Industries* indicate, and as the commentators cited by Justice O'Connor

---

[*] Justice Scalia, joined by Chief Justice Rehnquist, filed a separate dissenting opinion in *American Trucking Associations.* This dissent tracked the dissent in *Tyler Pipe Industries.*

*supra* emphasize, the utilization of the internal consistency test, as a discrimination test, to invalidate taxes other than net income taxes results in a disregard of actual economic effects of state taxes on interstate businesses. Instead, such a test looks to hypothetical taxes of other states to determine the discrimination question. This approach is certainly an aberration in the trend of the last decade of deciding interstate commerce taxation cases with a view toward the practical economic effects.

Notwithstanding these major problems with the internal consistency test as applied in *Armco, American Trucking Associations* and *Tyler Pipe Industries*, these cases are binding precedents which this Court must follow. Accordingly, having stated my reservations as to the concept, I concur with the majority's application of the internal consistency test to the present case.